In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-3388

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ETHEL SHELTON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:14-cr-00129-JVB-JEM-2 — **Joseph S. Van Bokkelen**, *Judge.*

ARGUED NOVEMBER 13, 2020 — DECIDED MAY 14, 2021

Before FLAUM, ROVNER, and BRENNAN, *Circuit Judges.*

ROVNER, *Circuit Judge.* Demoted, disparaged, and deprived of a free government car, Stafford Garbutt decided that he could no longer tolerate what he believed to be criminal conduct by his boss and co-workers, conduct that he himself had been engaging in for more than ten years. After his anonymous letters to a local newspaper and to the United

States Attorney's office accusing his former friend and boss of official misconduct failed to garner any response, he approached the United States Attorney's office in person with his story. That office directed him to the FBI, where he began a partnership with an agent who eventually directed him to conduct warrantless searches of his co-workers' offices. Garbutt's actions ultimately ensnared not only his intended target, Calumet Township Trustee Mary Elgin, but also Elgin's administrative assistant, Ethel Shelton, the defendant here. After Elgin took a plea deal, a jury convicted Ethel Shelton of conspiracy to commit wire fraud and conspiracy to commit honest services wire fraud related to her actions as an employee of the Calumet Township Trustee's Office. Shelton learned mid-trial that the FBI agent had directed Garbutt to conduct warrantless searches of her office. Although the district court tried to mitigate any damage by allowing Shelton to move post-trial for relief, the court ultimately denied her motion. We reverse and remand.

## I.

Mary Elgin first ran for the post of Trustee of Calumet Township in 2002. The Trustee's Office was charged with helping people in the community in need of assistance in areas such as jobs, food, housing, and the like. Elgin had previously been a union official in the United Steelworkers of America, and she met Stafford Garbutt at an international convention for the union in 1980. Garbutt, who holds dual citizenship in Belize and the United States, was impressed with Elgin and began to help her with campaigns for union leadership posts. When Elgin decided to run for the position of Trustee of Calumet Township in 2002, she contacted Garbutt and asked

him to help. Garbutt, who was living in Belize at the time and working as an assistant to the Deputy Prime Minister of that country, agreed to help and immediately drafted a program for her election. He moved from Belize (where he had a wife and daughter) into Elgin's home in Gary, Indiana, where he remained for several months. He created a political action committee for her, developed newsletters and flyers, and worked on all aspects of her campaign. That campaign marked the first of Elgin's three successful bids for the position of Trustee, a post she held for twelve years. Garbutt conceded at trial that he had an intimate relationship with Elgin (although he denied it was sexual in nature), and admitted that they traveled and socialized together. After Elgin's first successful campaign for Trustee, she hired Garbutt to work at the Trustee's Office and allowed him to write his own job description and essentially name his own salary.

The Trustee's Office was organized with Elgin at the top, and several deputies reporting to her, including a chief deputy who acted as the principal administrator for the Office. The deputies supervised the various departments that made up the Trustee's Office. Elgin hired Garbutt to work as her "executive aide" (a position that did not previously exist in that Office) at a salary of $60,000 per year. Only Elgin herself and the chief deputy earned higher salaries. Garbutt had insisted that he would not be responsible to anyone but the Trustee and that the chief deputy could not direct him "in any manner, shape, or form." R. 257, at 283. Garbutt's official responsibilities included public relations, speech writing, newsletter editing, and interacting with local and state officials on issues pertinent to the Trustee's Office. Although he was not a deputy, Elgin

granted him all of the perks and privileges of being a deputy, including a government car for his exclusive use, and participating in meetings that Elgin held with the deputies. Unlike the deputies, he had no supervisory responsibilities.

From the very beginning of his job, Garbutt's unofficial duties included Elgin's political campaign work. Because he understood that he should not perform political work at the Township Office, he initially completed these tasks at his home. But he soon began to also engage in political tasks at the office, where blurring the line between political work and office duties was the norm under Elgin's leadership. Ironically, Garbutt had drafted in 2005 the official Trustee's Office policy prohibiting political activities during Township hours and on Township property. Each employee, including Garbutt, was required to read and sign that policy. The policy warned that violations would lead to disciplinary action up to and including termination.

In addition to Garbutt, Elgin also hired her friend Ethel Shelton as a financial clerk, and in 2006, elevated her to the post of administrative assistant. Shelton's job responsibilities included the usual secretarial tasks such as answering phones, filing, handling mail, and assisting clients at Elgin's direction, especially when Elgin was unavailable to do so herself. Although Elgin directed Shelton to perform secretarial tasks for Garbutt whenever he asked for assistance, Garbutt did not supervise Shelton and he rarely made use of her services.

Like Garbutt, Shelton had unofficial responsibilities related to Elgin's campaign work. Elgin held three fundraisers a year: the Extravaganza event, with ticket prices of $100 each; the

Prayer Breakfast, run by Women for Elgin, with more modestly priced $30 tickets; and a Mardi Gras event held by a men's group known as Elgin's Eagles, with $15 tickets. Tickets for these events were sold to the public at large, to Township vendors, and to employees of the Trustees' Office. Elgin determined how many tickets each employee would be expected to purchase based on each employee's salary, and Shelton packaged the tickets (sometimes with Garbutt's help) into envelopes labeled with each employee's name. Elgin directed the deputies to distribute the tickets to the employees who reported to them. The prior Trustee had expected employees to provide a 2% kickback of their salaries in support of his campaigns; Elgin abolished that program and instead sought "voluntary" ticket purchases from employees. Many employees bought the tickets or sold them to others, and some also volunteered to work at Elgin's campaign events. Payments for the tickets were sometimes returned to the deputies, and sometimes given directly to Shelton or left on her office chair. At Elgin's direction, Shelton kept track of ticket purchases, noting names and amounts for campaign reporting purposes, and for Elgin's use otherwise. During Elgin's terms in office, a property tax cap resulted in severe budget cuts to the Office, and consequently, the number of employees working in the Trustee's Office was significantly reduced. Some employees testified that they purchased the tickets in the belief that support of Elgin's campaigns would spare them from the layoffs occasioned by budgetary constraints.

As Elgin completed her third and final term as Trustee, Shelton and her co-defendant Alex Wheeler, who was a deputy, both decided to run for positions on the Township

Board, which would have provided them with oversight responsibilities over the Trustee's Office. As she had done with Elgin's campaigns, Shelton performed some of her campaign work at the Trustee's Office. Although she testified that she limited campaign work for Elgin and for herself to her lunch hour, approved break periods, and the hours before and after the official workday, there was evidence that she performed campaign work during times that she was on the clock for the Trustee's Office, sometimes using the resources of that Office, including computers and printers.

At or near the time that Garbutt decided to become a government informant, he had a falling out with Elgin. At a meeting with Elgin's inner circle, Elgin and Garbutt had a "tiff" in which Elgin "might have" called him a "dumb motherf****r," and he "might have" called her vulgar names as well. R. 257, at 265. Elgin demoted Garbutt, docked his salary $15,000, barred him from attending meetings with the deputies, and took away his government car, which was the only car he had at the time. Garbutt decided to send an anonymous letter to a local newspaper accusing Elgin of unlawful conduct. The newspaper apparently ignored this letter, so Garbutt next tried the United States Attorney's office, again with an anonymous letter.[1] When that letter also produced no results, he went in person to the United States Attorney's office to complain about Elgin. That office referred him to the FBI.

---

[1] At trial, Garbutt first denied sending an anonymous letter to the United States Attorney's office, R. 257, at 207, and then admitted doing so when shown the letter. R. 257, at 271–72.

Garbutt wasted no time with the referral, calling FBI Agent Nathan Holbrook from the parking lot of the United States Attorney's office. He met with Holbrook a few days later. Garbutt brought with him an envelope full of campaign documents, programs and brochures that he told Holbrook were created with Township resources on Township time. Garbutt knew that this was so because he was the person who had created the campaign materials on Township time, using Township resources.

Garbutt told Agent Holbrook that he came forward with these accusations against Elgin and his co-workers in part because he had learned of charges against another local official, George Van Til, for similar conduct. Van Til, an elected County Surveyor, faced federal charges for using his office and his employees to run his re-election campaign. The meeting convinced Holbrook to open an investigation. Holbrook asked Garbutt if he would be willing to provide additional evidence and potentially record his co-workers. Garbutt agreed to do so. Holbrook ran a criminal background check on Garbutt, and began directing him to collect documents from the offices of his co-workers. Ultimately, Agent Holbrook provided Garbutt with a sophisticated, concealed recording device. At Agent Holbrook's direction, Garbutt eventually provided to the FBI more than one hundred recordings and a large number of documents that he gathered from the offices of his co-workers. We will detail the facts surrounding Garbutt's collection of that evidence in our discussion below assessing the propriety of his actions and those of Agent Holbrook. The information and evidence that Garbutt collected was then used to obtain a warrant to search the offices of the Trustee. And the evidence

obtained from that search warrant in turn provided the basis for federal charges against Elgin, her son Steven Hunter (who was also her employee), Shelton, and Wheeler. Elgin and her son pled guilty. Shelton and Wheeler went to trial, where information obtained as a result of the search warrant was entered into evidence. Shelton faced two counts at trial: conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349; and conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 and 1349. After initially deadlocking, the jury acquitted Wheeler but convicted Shelton on both counts.

During the trial, it became apparent to Shelton's lawyer that Garbutt, acting as a government agent, had searched Shelton's office without a warrant and provided copies of documents that he found there to Holbrook. Shelton immediately moved for a mistrial, asserting violations of the Fourth Amendment as well as violations of the government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The court took the motion under advisement. At the conclusion of the government's case-in-chief, Shelton moved for a directed verdict on the grounds of insufficiency of the evidence. The court denied that motion. After trial, the court directed the parties to brief the issues raised in the motion for a mistrial. Shelton asserted that the government engaged in prosecutorial misconduct when it instructed its informant to engage in a warrantless search for documents in areas over which the informant lacked any authority or consent to search. She also asserted that she could not have raised her objections earlier because the government failed to reveal the relevant facts until the trial itself. The government opposed

Shelton's motion on the grounds that: (1) the objection to the search was raised too late; (2) Garbutt's collection of documents was not improper; and (3) the warrant that produced the evidence admitted at trial would have been granted even if references to the challenged documents had been excluded from it. The court rejected the government's assertion that Shelton was late in raising her objection, but ultimately denied Shelton's motion, concluding that she lacked a reasonable expectation of privacy in the areas searched by Garbutt. The court also concluded that the warrant would have been issued even with the offending materials excised from the warrant application. Shelton appeals.

## II.

In addition to challenging the district court's denial of her motion for a mistrial on Fourth Amendment grounds, Shelton also challenges the sufficiency of the evidence on both the conspiracy to commit honest services wire fraud count and the conspiracy to commit wire fraud count. We review the denial of the motion for a mistrial for an abuse of discretion. *United States v. Hilliard*, 851 F.3d 768, 778 (7th Cir. 2017). A decision that rests on an error of law is always an abuse of discretion. *Brock-Miller v. United States*, 887 F.3d 298, 304 (7th Cir. 2018); *United States v. Simon*, 727 F.3d 682, 696 (7th Cir. 2013). Incorporated in Shelton's motion for a mistrial is a motion to suppress the items that Garbutt seized from Shelton's work area and to suppress the evidence that was collected pursuant to a warrant that was based on the items that Garbutt collected. In reviewing the denial of a motion to suppress, we review findings of fact for clear error and questions of law *de novo*. *United States v. Wanjiku*, 919 F.3d 472, 479 (7th Cir. 2019); *United*

*States v. Velazquez*, 906 F.3d 554, 557 (7th Cir. 2018). We review *de novo* a challenge to the sufficiency of the evidence, determining only whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the government. *United States v. Cherry*, 920 F.3d 1126, 1133 (7th Cir. 2019); *United States v. Stewart*, 902 F.3d 664, 679 (7th Cir. 2018); *United States v. Webster*, 775 F.3d 897, 904–05 (7th Cir. 2015).

## A.

Shelton argues the district court abused its discretion when it denied her motion for a mistrial, which was based on a violation of her Fourth Amendment right to be free from unreasonable searches and seizures, and on the government's violation of its obligations under *Brady* and *Giglio*. The court erred, Shelton argues, when it concluded that she lacked any reasonable expectation of privacy in her office. The information that Garbutt collected from her office was then used to support an application for a warrant that authorized a search of the entire Trustee's office, resulting in the collection of evidence that was admitted at trial. Shelton contends that the evidence introduced at trial was the fruit of the poisonous tree (the initial warrantless search by Garbutt), and should have been suppressed. Moreover, Shelton contends, the government was obligated under *Brady* and *Giglio* to reveal to Shelton prior to trial that Agent Holbrook had directed Garbutt, acting as an agent of the government, to engage in a warrantless and unlawful search of her office. The government counters that Shelton failed to demonstrate that she had a reasonable expectation of privacy in her office and desk from an intrusion

by Garbutt or by anyone else. The government also contends that the warrant that led to the discovery of the evidence admitted at trial would have been issued even in the absence of the information gleaned from Garbutt's collection of documents from Shelton's desk. The evidence admitted at trial was therefore not the fruit of the poisonous tree, the government maintains.

During Garbutt's testimony, Shelton's counsel learned for the first time that Garbutt had searched[2] Shelton's office (as well as Elgin's office and a storage room where Shelton kept some files) at the direction of Agent Holbrook. That revelation was followed by an admission by Agent Holbrook that Garbutt was acting as a government agent when he conducted those searches, that Holbrook himself had directed the searches, and that Holbrook had not secured a warrant prior to directing Garbutt to conduct the searches. In the district court, the government conceded that, if the court concluded that Shelton had a reasonable expectation of privacy in her office, no exception to the warrant requirement existed that would have permitted Garbutt to enter her office. R. 234, at 11–12, n.6. This

---

[2] The word "search" is a term of art in Fourth Amendment analysis. Generally, if the person objecting to a government intrusion lacks a reasonable expectation of privacy in the area examined, we conclude that no "search" has occurred for Fourth Amendment purposes. We use the word here as shorthand for Garbutt's actions because, as we conclude below, Shelton did in fact have a reasonable expectation of privacy in her office against intrusions by Garbutt and others. *See United States v. Correa*, 908 F.3d 208, 217 (7th Cir. 2018) (a court determines whether a search has occurred for Fourth Amendment purposes based on the existence of a reasonable expectation of privacy).

concession continues on appeal, and so the determinative question is whether Shelton had a reasonable expectation of privacy in her office.

**1.**

We turn to the facts related to Garbutt's retrieval of documents from Shelton's desk and other areas of the office. After Garbutt testified at trial that he entered the offices of his co-workers and collected documents at Agent Holbrook's direction, both the government and Shelton's counsel explored the circumstances of the document collection during Agent Holbrook's testimony. In direct examination, Agent Holbrook acknowledged that when Garbutt was acting on behalf of the FBI in recording conversations, the rules regarding the collection of evidence that applied to Agent Holbrook also applied to Garbutt. R. 258, at 10–11. Defense counsel later questioned Agent Holbrook regarding the circumstances under which Garbutt collected documents from his co-workers' offices:

> Q. And did he [Garbutt] bring you documents that he took out of other people's offices?
>
> A. Yes.
>
> Q. And did you accept those documents?
>
> A. Yes.
>
> Q. Did you ask Mr. Garbutt to do that?
>
> A. Yes.
>
> Q. So he was acting as a law enforcement agent when he searched the offices of the Calumet Township?

A.  Yes.

Q.  Now, you're aware of the requirements for a warrant?

A.  Yes.

Q.  And did you seek a warrant before you allowed Mr. Garbutt to go search the offices of the Calumet Township?

A.  No.

R. 258, at 70.

Agent Holbrook explained that he took this course of action based on his belief that Garbutt had a right of access to these offices, and that he could therefore gather anything that was in plain view in these spaces. As we will discuss below, Agent Holbrook defined "right of access" as the "right to be there and the knowledge that he routinely goes there without the individuals being there. That was the big factor." R. 258, at 181. The primary basis for Agent Holbrook's belief that Garbutt had the right to access his co-workers' offices when they were not present came from Garbutt himself. Garbutt apparently told Agent Holbrook that he signed the time-keeping sheet in Shelton's office, sometimes before she arrived at the office. Agent Holbrook also testified that Garbutt told him that he "had permission to go in those offices and that he routinely went in those offices," and that "the individuals knew that he did so." R. 258, at 181–82. Rather than seeking the assessment of a neutral magistrate as to the appropriateness of sending Garbutt in to search those offices, Agent Holbrook took Garbutt at his word, and decided that he could direct Garbutt

to enter Shelton's office when she was not present and copy any documents in plain view. The government asserts that Holbrook's assessment was lawful because Shelton lacked any reasonable expectation of privacy in her office.

Testimony at trial established that the Trustee's Office occupied four buildings, including a three-story office building that served as the main office of the Calumet Township Trustee; a north annex; a multipurpose center; and a service office. The north annex was used for commercial purposes and Township business. The multipurpose center housed a women's shelter and was also used for residents in need during times of extreme heat or cold. It also contained administrative offices, a large meeting room and space that was rented out for community functions. The main office building housed most of the high-level administrators of the Trustee's Office.

Mary Elgin's office was on the third floor of the main office building. Elgin's square-shaped office suite could be entered through double doors near the elevator. Those doors led to a large open area. Within this open space was a seating area for Elgin's visitors. Beyond the visitor's area (to the right of the double doors) was a door to Shelton's office. Straight across from the double doors was a conference room. To the right of the conference room, in the back right corner, was Elgin's office. Elgin's office had three entrances: one directly from the large open area; one from the conference room; and one from Shelton's office. On the other side of the double doors, past the elevator and across a wide corridor from the offices of Shelton and Elgin was Garbutt's office. R. 257, at 56–58. Only one other employee, switchboard operator Laura McFarland, worked on

the third floor. McFarland sat at a desk in the open area in Elgin's suite, outside of Shelton's office.

Garbutt had a key to the building that allowed him to enter before the usual 8 a.m. start of the business day at the Trustee's Office.[3] He did not have keys to the individual offices within the building, but offices on the third floor were not typically locked in the evening. When the doors to Elgin's suite opened, a chime would sound to alert the occupants that someone was coming in. R. 257, at 107. All employees were required to mark a time-keeping sheet indicating their arrival and departure from the office. The time-keeping sheet for Garbutt was kept in Shelton's office, and on days when he arrived in the office before Shelton, he would enter Shelton's empty office to sign the sheet.[4] Garbutt also visited Shelton in her office on a regular basis, sometimes two or three times a day. Garbutt sometimes passed Shelton's office on his way to visit Elgin. Other employees of the Trustee's Office sometimes entered Shelton's office when she was not present in order to drop off

---

[3] The regular hours for employees of the Trustee's Office were 8 a.m. to 4 p.m., although Elgin allowed variations of this schedule. Garbutt opted to sometimes begin his workday early.

[4] The record does not indicate where in Shelton's office the time-keeping sheet (which the parties also refer to as a "sign-in sheet") was kept. Among the materials that Garbutt supplied to Agent Holbrook were photographs of Shelton's desktop. No sign-in sheet is visible in any photograph of Shelton's desk. However, in other photographs of a table immediately inside of Shelton's office door, a clipboard with paper and a pen is visible, the only object resembling a sign-in sheet anywhere in the record on appeal. The record does not definitively resolve the location of the sign-in sheet within Shelton's office.

items for her on her chair. For example, testimony indicated that employees who purchased fundraising tickets for Elgin's events sometimes handed the payments directly to Shelton or left the payments on her office chair if she happened to be absent at the moment.

That said, Shelton's office was her own private, fully-enclosed work space: although business invitees visited it for limited purposes (including in her absence), she did not share her office or her desk with anyone else. She had a door, and she used it to exercise her right to exclude co-workers and visitors from her office. Indeed, one of the documents that Garbutt delivered to Agent Holbrook during his evidence collection efforts was an email from Shelton "to all staff of the Calumet Township on December 10, 2013 advising that her door will be closed during work hours for more privacy." R. 234-5, at 10. Shelton was the sole occupant of her office for more than seven years, and as is apparent from the documents that Garbutt collected and the photographs that he took, she kept personal, non-work-related items in her office. On at least one occasion when Garbutt was visiting Shelton in her office, another employee came to visit, and Shelton turned papers face-down on her desk so that the visitor could not see them. When Garbutt visited Shelton in her office, he normally knocked before entering. Tr. Ex. 13T (described and quoted at R. 234, at 16–17).

### 2.

Shelton, as the defendant objecting to the search, bears the burden of proving a legitimate expectation of privacy in the area searched. *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir.

2003). "[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). *See also Pitts*, 322 F.3d at 456 (same). The Supreme Court has recognized repeatedly that employees may have a reasonable expectation of privacy in the workplace:

> Within the workplace context, this Court has recognized that employees may have a reasonable expectation of privacy against intrusions by police. … As with the expectation of privacy in one's home, such an expectation in one's place of work is "based upon societal expectations that have deep roots in the history of the Amendment."

*O'Connor v. Ortega*, 480 U.S. 709, 716–18 (1987) (quoting *Oliver v. United States*, 466 U.S. 170, 178, n.8 (1984)). For example, the Court held that a union employee who shared an office with other union employees had a privacy interest in the office sufficient to challenge the warrantless search of that office:

> It has long been settled that one has standing to object to a search of his office, as well as of his home. … [I]t seems clear that if DeForte had occupied a 'private' office in the union headquarters, and union records had been seized from a desk or a filing cabinet in that office, he would have had standing. … In such a 'private' office, DeForte would have been entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his union superiors.

*Mancusi v. DeForte*, 392 U.S. 364, 369 (1968).

Like private employees, government employees may also have a reasonable expectation of privacy in their offices, depending on the surrounding circumstances:

> Given the societal expectations of privacy in one's place of work expressed in both *Oliver* and *Mancusi*, we reject the contention … that public employees can never have a reasonable expectation of privacy in their place of work. Individuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer. The operational realities of the workplace, however, may make some employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official. Public employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation. Indeed, in *Mancusi* itself, the Court suggested that the union employee did not have a reasonable expectation of privacy against his union supervisors. … The employee's expectation of privacy must be assessed in the context of the employment relation. An office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees. Instead, in many cases offices are continually entered by fellow employees and other visitors during the workday for conferences, consultations,

and other work-related visits. Simply put, it is the nature of government offices that others—such as fellow employees, supervisors, consensual visitors, and the general public—may have frequent access to an individual's office. We agree … that "[c]onstitutional protection against unreasonable searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer," … but some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable. … Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis.

*O'Connor*, 480 U.S. at 716–18 (plurality opinion).

In *O'Connor*, the Court ultimately concluded that a government doctor had a reasonable expectation of privacy in his hospital office, desk and filing cabinets because he did not share his desk or filing cabinets with any other employees; he had occupied his office for seventeen years; he kept materials in his office unrelated to his work such as personal correspondence, personal financial records and personal gifts and mementos; and the hospital had no policy discouraging employees from storing personal papers and effects in their

desks or file cabinets. *O'Connor*, 480 U.S. at 718–19.[5] Similarly, in *Mancusi*, the Court found that DeForte had Fourth Amendment standing to object to the government seizure of records from his union office even though his office consisted of a large room that he shared with several other union officials, and even though the records were taken from a part of the office that was not reserved for DeForte's exclusive use, because DeForte spent a considerable amount of time in the office, and he had custody of the papers at the moment of their seizure. *Mancusi*, 392 U.S. at 368–69.

**3.**

The district court acknowledged that a person's office and the papers contained in it could be protected by the Fourth Amendment. But the court concluded that several factors "extinguish[ed] [Shelton's] reasonable expectation of privacy" in her office and desk: (1) Garbutt had to enter Shelton's office to sign his time-keeping sheets; (2) Garbutt "passed by" Shelton's office to visit Elgin, which he did regularly; (3) Garbutt would often visit Shelton's office to speak with her; (4) Garbutt was often the first to arrive for work, and Shelton knew that workers could arrive early; (5) Elgin had security

---

[5] The Court went on to set a balancing test in the case of searches conducted by a public employer, weighing the invasion of the employee's legitimate expectation of privacy against the government employer's need for supervision, control, and the efficient operation of the workplace. The instant case does not involve a search of the workplace by the government *as an employer* but rather a search by law enforcement seeking evidence of a crime. *O'Connor*, 480 U.S. at 719–20.

cameras throughout the premises;[6] (6) the Trustee's Office had a policy allowing workplace searches of employees, their possessions, and items issued by the Office at all times while on the premises, a policy documented in an employee hand-book that Shelton received and signed; and (7) Shelton left the documents on her desk. R. 280, at 4. Citing these factors, the court concluded, "Thus, even if Defendant had a reasonable expectation of privacy *in* her desk, no reasonable person would expect privacy as to documents laying *on* a desk in what amounts to a monitored, high-traffic area subject to random searches." R. 280, at 5.

The question for the district court was whether Shelton had a reasonable expectation of privacy in her office against intrusions by law enforcement in general and by her co-worker, Garbutt, as its agent, in particular. *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"). Under *Katz*, whatever Shelton knowingly exposed to Garbutt was not protected by the Fourth Amendment. The court relied on those seven factors to conclude that Shelton lacked **any** reasonable

---

[6] According to Shelton, Elgin's security cameras allowed Elgin to see "everything that was going on. So when you came to work, when you left, whether or not you went across the hall, went downstairs, anything that happened in that office, she could see." R. 329, at 167–68. Although it is apparent from Shelton's testimony that cameras were used to monitor hallways, entrances and exits, there is no evidence in the record that the cameras were present inside of private offices much less trained on workers' desks. In any case, as we discuss below, Garbutt did not have access to the video feed.

expectation of privacy in her office and desk, characterizing it as "a monitored, high-traffic area subject to random searches." The district court essentially found that Shelton's office was "so open to fellow employees or the public that no expectation of privacy [was] reasonable." *O'Connor*, 480 U.S. at 718. This conclusion rested on factual and legal errors.

We begin with the seven factors on which the district court relied in determining that Shelton had no reasonable expectation of privacy in her office or desk against intrusions by Garbutt. Two of the seven factors were wholly unrelated to Garbutt's right to access Shelton's office: the presence of security cameras in the main office building, and the Trustee's Office policy allowing workplace searches of employees and their possessions. The security cameras, which appear to have shown nothing more than the comings and goings of individuals in the building, were not monitored by Garbutt, and he had no access to the video feed. The only evidence regarding the security cameras came from Shelton. She testified that only Elgin, Elgin's son (who led the information technology department), and one other employee in the information technology department could view the areas monitored by the cameras. Again, there was no evidence that the cameras provided views of the inside of any private office, much less Shelton's desktop in particular.

Similarly, the only persons authorized by the Employee Handbook to conduct searches of the workplace for safety, security, cleanliness and neatness were the Security Deputy, and the Deputy or supervisor of the affected employee. R. 331-1, at 39–43. Garbutt was not the Security Deputy (R. 257, at 28); he was not a Deputy (R. 257, at 155); he twice denied

that he was Shelton's supervisor (R. 257, at 155–56); and he even denied that he had any authority over Shelton at all (R. 257, at 156). Nor does he meet the definition of "supervisor" in the Employee Handbook, the very document on which the government relied in propounding this theory. R. 331-1, at 8–9. The court thus erred in concluding that the Employee Handbook was a source of any authority for Garbutt to enter Shelton's office. Neither the security cameras nor these workplace policies gave Garbutt any right of access to Shelton's office. Moreover, the district court conflated the standards for access by the government as employer and access by others (including co-workers and law enforcement). The court thus erred in relying on those two factors in concluding that Shelton lacked a reasonable expectation of privacy against intrusions by Garbutt.

**4.**

The court also relied on four other factors, specific to Garbutt, in finding that Shelton's expectation of privacy in her office was extinguished: Garbutt entered Shelton's office daily to sign his time-sheet; Garbutt "passed by" Shelton's office to visit Elgin;[7] Garbutt regularly visited Shelton in her office; and

---

[7] The government asserts in its appellate brief that Garbutt and other visitors had to pass through Shelton's office in order to visit Elgin. The record cites on which the government relies do not support that contention, and the map that Garbutt supplied of the office configuration showed that two of the three paths into Elgin's office did not involve passing through Shelton's office. Indeed, the most direct path to Elgin's office did not involve Shelton's office. The district court found only that Garbutt "passed by" Shelton's office when visiting Elgin, not that he walked through it.

(continued...)

Garbutt often arrived early at work. The court combined these factors with a fifth factor, namely, that the documents at issue were on top of Shelton's desk, to conclude that Shelton had no privacy interest against Garbutt in materials atop the desk. To be sure, anything that Shelton knowingly exposed to Garbutt when he was present as a business invitee to her office would not be subject to Fourth Amendment protection. *Katz*, 389 U.S. at 351. The court essentially found that the documents at issue were in plain view of Garbutt when he went into Shelton's office. But as we discuss below, Garbutt far exceeded the limits of his access as a business invitee when he gathered the documents and photographs at issue here.

When comparing the factors on which the district court relied to the Court's reasoning in *Mancusi* and *O'Connor*, it is difficult to square the evidence presented about Shelton's office with a finding that she had **no** expectation of privacy against intrusions by Garbutt or others. On the contrary, for seven years, she was the sole occupant of the office connected to the inner sanctum of the Trustee herself, on the top floor of a secure building[8] that largely contained administrative offices. Only four employees worked on that floor. Although she could not exclude Trustee Elgin from her office, Shelton had a door that she could and did close to other employees, including

---

[7] (...continued)

Based on the map, Garbutt would have had to go out of his way to pass through Shelton's office on his way to visit Elgin.

[8] The primary entrance on the first floor of the main office building was staffed by security guards and monitored with metal detectors. R. 234-7, at 12.

Garbutt. She kept personal items in her office, and turned down papers on her desk when she wished to keep them private from visitors entering the space. Garbutt himself knocked before entering when visiting Shelton in her office. Her office was certainly no less private than that of the union employee in a shared office, and was arguably as private as the office of Ortega, the state physician who ran a residency program for training young physicians at a public hospital.

That Garbutt "passed by" Shelton's office on his way to visit Elgin does not weigh in favor of the court's finding that her office was so open to visitors that she lacked any reasonable expectation of privacy in it. Even if some visitors passed through Shelton's office in order to visit Elgin, there was no evidence that Shelton's office was so open that members of the public could wander in. In fact, there was a separate waiting area outside of Shelton's office for outside visitors, and the most direct paths for employees and other visitors to meet with Elgin bypassed Shelton's office. There was both a direct entrance into Elgin's office from the open area, and an entrance through the conference room. There was also no evidence that other employees, including Garbutt, entered for anything other than limited purposes as business invitees.

Importantly, there was no evidence that Garbutt collected this evidence when he was in Shelton's office as a business invitee, dropping items off on Shelton's chair, signing the timekeeping sheet, passing by to see Elgin, or stopping in to visit Shelton herself, the factors on which the district court relied. On the contrary, Garbutt searched his co-workers' offices "more often than not, very early in the morning" before they arrived at the office. R. 257, at 211. *See also* R. 257, at 296

(Garbutt confirming that he could and did go through his co-workers' offices outside of business hours without anyone knowing that he had been there). Undoubtedly, he could not have accomplished his task of perusing their offices for incriminating material, removing and photocopying documents, and then returning the originals during the normal workday when the occupants of those offices were present.

There is no doubt that Shelton had as much right to exclude the police, the public, and co-workers as did the union official in the shared office or the state doctor in a private office. She had a reasonable expectation that co-workers (including Garbutt) and other visitors would not access her office or desk outside of regular office hours at times when she was not present, except for brief and very limited purposes. Like any office worker with a private office, she had a reasonable expectation that, although her employer or supervisor might intrude into her space and peruse her desk for work-related purposes, her co-workers had no license to do so. Nothing in the Employee Handbook or any office practice would have led her to believe that her private office was not in fact private. As we noted, no one other than the Trustee herself or the Security Deputy had the right to search her desk or office under any workplace policies. Although Agent Holbrook relied on Garbutt's self-proclaimed "permission" to enter Shelton's office, the district court did not rely on this rationale, instead concluding erroneously that Shelton's office was a "monitored, high-traffic area subject to random searches," and thus so open that she lacked **any** expectation of privacy in it. But as we noted, it was not monitored or subject to random searches *by*

*Garbutt*. Moreover, the court's characterization of Shelton's office as a "high-traffic area" is not supported by the record.

Behavior such as Garbutt's, where he entered Shelton's private office outside of normal business hours and lingered beyond any legitimate, anticipated or permissible purpose in order to review and copy the papers on top of her desk would be unacceptable in any workplace. Because he was acting as an agent of the government at the time, and because he possessed no warrant to conduct this search, his actions violated the Fourth Amendment. *Gouled v. United States*, 255 U.S. 298, 305–06 (1921), *overruled on other grounds by Warden, Maryland Penitentiary v. Haydon*, 387 U.S. 294 (1967); *United States v. Ressler*, 536 F.2d 208, 211–12 (7th Cir. 1976). In *Gouled*, the Supreme Court considered whether "the secret taking, without force, from the house or office of one suspected of crime, of a paper belonging to him, of evidential value only, by a representative of any branch or subdivision of the government of the United States, [is] a violation of the Fourth Amendment[.]" *Gouled*, 255 U.S. at 263. Gouled was under investigation for fraud in a government contract. An Army private who was attached to the Intelligence Department was a business acquaintance of Gouled. Under the direction of his superior officers, the private pretended to make a friendly call on Gouled and gained admission to his office in his absence. Without a warrant, the private seized several documents from Gouled's office and provided them to the prosecutor. One of the documents was then introduced in evidence over Gouled's objection at his criminal trial.

The Court noted that the Fourth Amendment prohibits unreasonable searches and seizures. It would be unreasonable

under the Fourth Amendment for a government officer to obtain entrance to a person's house or office by force or by an illegal threat or show of force, amounting to coercion, in order to search for and seize his private papers, the Court reasoned:

> [I]t is impossible to successfully contend that a like search and seizure would be a reasonable one if only admission were obtained by stealth instead of by force or coercion. The security and privacy of the home or office and of the papers of the owner would be as much invaded and the search and seizure would be as much against his will in the one case as in the other, and it must therefore be regarded as equally in violation of his constitutional rights.

*Gouled*, 255 U.S. at 305–06. The Court concluded by answering the question posed:

> [W]hether entrance to the home or office of a person suspected of crime be obtained by a representative of any branch or subdivision of the government of the United States by stealth, or through social acquaintance, or in the guise of a business call, and whether the owner be present or not when he enters, any search and seizure subsequently and secretly made in his absence, falls within the scope of the prohibition of the Fourth Amendment, and therefore the answer to the first question must be in the affirmative.

*Gouled*, 255 U.S. at 306.

We reaffirmed this principle in *Ressler*, explaining that "an entry by an undercover agent is not illegal if he entered for the 'very purposes contemplated by the occupant.'" *Ressler*, 536 F.2d at 211 (quoting *Lewis v. United States*, 385 U.S. 206, 211 (1966)). But reading *Gouled* and *Lewis* together, we remarked:

> When an agent assumes a particular pose in order to gain entry into certain premises and then obtains information by engaging in activity not generally expected of one assuming that pose, that information is illegally obtained. Thus, an agent may not enter a premises as an acquaintance of the owner and conduct an unauthorized general search of the premises. Nor may an agent compel his entry into a suspect's premises to conduct a search by claiming to be a police officer investigating a non-existent burglary; a Western Union agent; or a member of a private lodge.

*Ressler*, 536 F.2d at 211 (internal citations omitted). In each of those cases, the government agents were not present for the "very purposes contemplated by the occupant." The occupant in those situations "did not voluntarily consent to the exposure of the information, but exposed it in response to an affirmative misrepresentation." *Ressler*, 536 F.2d at 211. Information obtained in these intrusions was not "knowingly exposed to the public" under *Katz*, and the occupant did not "knowingly assume the risk that the exposed information might be reported to government authorities." *Ressler*, 536 F.2d at 212.

There is no evidence that Garbutt collected the information that he provided to Agent Holbrook as a business invitee or in

any capacity that Shelton knowingly anticipated. He was not present in her office for the "very purposes contemplated by the occupant" but rather for the purpose of gathering evidence as an agent of the government. He used his building key to enter the Trustee's suite before normal business hours, gaining access to Shelton's office by stealth, in a manner similar to the government agent in *Gouled*. Although he normally entered Shelton's office to sign the time-keeping sheet and sometimes arrived early at the office, there was no evidence that signing the time-keeping sheet afforded Garbutt access to the top of Shelton's desk. Indeed, the only evidence in the record on the location of the time-keeping sheet indicates that, wherever it was in her office, it was not visible on her desk. Nor was there evidence that Garbutt gathered this evidence when he was visiting Shelton, or passing by her office to visit Elgin. Instead, he entered her office not as a business invitee for an expected or authorized purpose but at times that he knew she would not be present for the express purpose of searching for documents at the direction of Agent Holbrook. *See e.g.* R. 257, at 296 (Garbutt confirming that he could and did go through other workers' offices outside of business hours without anyone knowing he had done so). In doing so, he far exceeded the scope of the invitation. *Cf. United States v. Scherer*, 673 F.2d 176, 182 (7th Cir. 1982) (distinguishing cases where law enforcement agent exceeded scope of warrant or scope of consent in collecting evidence); *United States v. Dichiarinte*, 445 F.2d 126, 129–30 (7th Cir. 1971) (noting that a consent search is reasonable only if kept within the bounds of the actual consent, and suppressing incriminating documents found by agents searching for narcotics who overstepped the scope of consent

by reading documents they discovered during that search because "the officers' use of defendant's limited consent as a ticket to get inside his home and conduct a general search cannot be allowed").

The district court also relied on the plain view doctrine, finding in its seventh factor that Shelton had no expectation of privacy in items placed on top of her desk. "The 'plain-view' doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California*, 496 U.S. 128, 133 (1990). "Under this plain view doctrine, a warrantless seizure is justified if first, the law enforcement officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; second, the item was in plain view; and third, its incriminating character was immediately apparent." *United States v. Cherry*, 920 F.3d 1126, 1137–38 (7th Cir. 2019). If a law enforcement officer is already lawfully present in an area, then merely inspecting objects that are already in view does not constitute an independent search because there is no additional invasion of a privacy interest. *Arizona v. Hicks*, 480 U.S. 321, 325 (1987). However, "taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the [space] or its contents, did produce a new invasion of respondent's privacy unjustified by the … circumstance that validated the entry." *Hicks*, 480 U.S. at 325. Under this reasoning, uncovering incriminating information by moving an object unrelated to the

objectives of the authorized intrusion constitutes a search for Fourth Amendment purposes. *Id.*

At trial, the government attempted to establish that the documents that Garbutt produced from Shelton's office (and other offices) came within the purview of the plain view doctrine. To that end, the government asked Agent Holbrook about the instructions he gave to Garbutt when sending him into his co-workers' offices in search of evidence:

> Q. Can you tell the jury what the plain view doctrine is?
>
> A. In, basically—if illegal—if evidence of illegal activity is in plain view and you have regular access to that area, then you can seize the piece of evidence.
>
> Q. So basically if it's out in plain sight, then there is no concern that it's being taken illegally. Is that a fair representation of it?
>
> A. Yes.

R. 258, at 157–58. Following an objection from the defense regarding the inaccuracy of that description, the government followed up to clarify:

> Q. But you can't take just anything; there has to be probable cause for you to take it. Is that also fair to say?
>
> A. Yes.

R. 258, at 158. This led to a second objection that the explanation was still a misrepresentation of the doctrine. After a failed

attempt to remedy the answer and after withdrawing a question, the government shifted to Agent Holbrook's instructions to Garbutt on where he could search:

Q. Did you give Mr. Garbutt instructions on where he was permitted to search?

A. Yes.

Q. What did you tell him?

A. He is permitted to search—I should say, to obtain items that were located in areas that he had known access to and that were in plain view. He was told that he could not go looking in drawers and cabinets. If it was in plain view, then he could copy that item or retrieve that item.

R. 258, at 157–59.

During cross-examination of Agent Holbrook, defense counsel explored further the instructions given to Garbutt as he retrieved documents. Agent Holbrook agreed that the plain-view doctrine presumes that a person is legally present in a place. Agent Holbrook also confirmed that he told Garbutt that "he could have or take documents from places he had access to." R. 258, at 180. Holbrook explained, "By access, I mean a right to be there and the knowledge that he routinely goes there without the individuals being there. That was the big factor." R. 258, at 181. Holbrook also asserted that Garbutt routinely went into the office in order to sign his time-keeping sheet, but as we noted there was no testimony regarding the location of the time-keeping sheet within Shelton's office, and

no evidence that Garbutt saw or collected any of the documents when he was in the office for that purpose. When asked how he knew that Garbutt had the permission of his office mates to be in their offices when they were not present, Holbrook denied that he relied solely on Garbutt's word and asserted, "I think [Garbutt] made comments on the recordings that they understood he was going in their offices without them being there, so their acknowledgment that he was going in their offices to us was approval to do so." R. 258, at 183. But he could not cite any particular recording and the government has not cited or supplied any such recording in the record on appeal. Moreover, Garbutt began collecting documents before he made any recordings, and during that time, Holbrook could only have relied on Garbutt's own assertions about his right to be in other people's offices.

As is evident from comparing Holbrook's testimony to case law on the plain view doctrine, the Agent's directions to Garbutt were inadequate at best and misleading at worst. Shelton had a private office and Garbutt was a business invitee who accessed it for limited purposes, such as signing the time-keeping sheet, dropping off an item on her chair, or visiting her. He far exceeded the lawful scope of his access when he entered Shelton's office outside of business hours, without a legitimate justification, and conducted a general search of everything visible within the space.[9]

---

[9]   Moreover, it appears from the documents that he brought to Agent Holbrook that he did not confine himself to the papers that could be viewed on the top of the desk or papers that were of an immediately apparent

(continued...)

Agent Holbrook forwent a warrant largely in reliance of Garbutt's representations about his permission to be in Shelton's office when she was not present. Rather than bringing the claim of this obviously interested party to a neutral magistrate for testing, the Agent in essence took a chance that a court would later agree with his assessment of Garbutt's credibility and his conclusion that Shelton lacked a reasonable expectation of privacy in her office. He compounded this error by giving the informant incomplete and misleading instructions on the scope of the plain view doctrine. In so doing, he essentially delegated to an informant—a man who was himself knee-deep in unlawful activity and seeking to ingratiate himself to the FBI Agent in order to avoid personal liability for his actions—the sensitive task of deciding whether and when he had authority to enter the offices of others in their absence and collect evidence. This was patently unreasonable:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate

---

[9] (...continued)
incriminating nature. *Dichiarinte*, 445 F.2d at 131 (documents are not in the purview of the plain view doctrine unless their criminal character is "apparent on a mere surface inspection"). On some days of his document collection, it appears that it would have been physically impossible for the number of documents and pages provided to all be in full view on the top of Shelton's desk. *See* R. 234-5 (listing materials that Garbutt retrieved from the offices of Shelton and Elgin).

> instead of being judged by the officer engaged in the
> often competitive enterprise of ferreting out crime.

*Johnson v. United States*, 333 U.S. 10, 13–14 (1948). *See also Williams v. Dart*, 967 F.3d 625, 633 (7th Cir. 2020) ("[A] core function of the Fourth Amendment is to put neutral decision-makers between unchecked official discretion and invasions of private liberty by search or seizure."). Yet even on appeal, the government relies on Holbrook's assessment of Garbutt's credibility to establish that Garbutt had broad permission to enter Shelton's office.

The government did not disclose this novel evidence collection method until mid-trial when Agent Holbrook, to his credit, answered honestly under oath how Garbutt came into possession of those documents.[10] The learned district judge, who described himself as "shocked" when he heard the Agent's testimony, was left with the unenviable task of deciding what to do mid-trial, with a jury seated. R. 258, at 77. He reasonably elected to continue the trial to verdict before

---

[10] At trial and even on appeal, the government insists that Shelton's counsel should have known prior to trial that Garbutt collected the evidence without a warrant because each document was labeled by Garbutt with the date and place of collection. Although Shelton's counsel might have been able to discern that Garbutt collected the evidence without a warrant, counsel had no way of knowing that Garbutt did so *at the direction of the FBI and acting as their agent*. The government fails to draw the distinction between the government accepting evidence that a source obtained unlawfully and the government directing the source unlawfully to obtain that evidence. There was no reason for Shelton to question whether the government acquired the evidence unlawfully until the testimony of Garbutt and Holbrook.

entertaining Shelton's motion for a mistrial and to suppress the evidence. When the jury convicted Shelton, the court was under the further pressure of considering that motion under the cloud of that verdict. This dilemna did not escape the court's notice, and in the opening paragraph of his opinion, the judge stated:

> While this Court denies Defendant's motion, it cannot help but note the open-ended scope of the informant's evidence hunt on Defendant's work desk. Although the government stayed within the bounds of the legal limits, this may have been more by luck than design.

R. 280, at 1. In other words, the court found the actions of the Agent and informant problematic but concluded that these actions were ultimately lawful because Shelton had no reasonable expectation of privacy in her office. As we have discussed above, we disagree that the government stayed within the bounds of the legal limits. For all of the reasons we have stated, the court erred when it concluded that Shelton lacked any reasonable expectation of privacy in her office and desk against intrusions by Garbutt as either a co-worker or an agent of the government.

## B.

After concluding that Shelton lacked a reasonable expectation of privacy against intrusions by Garbutt, the district court found in the alternative that the search warrant would still have been issued if the unlawfully obtained materials were excised from the warrant application. Shelton challenges this finding, contending that the unlawful searches of her office

infected the entire relationship between Garbutt and Agent Holbrook, and therefore also tainted the entire warrant application. According to Shelton, Garbutt established his credibility with Holbrook by complying with the Agent's directives to obtain documents from the Trustee's Office, including Shelton's office. She contends that Holbrook would not have pursued the investigation, supplied sophisticated recording equipment to Garbutt, or sought the warrant without this unlawfully obtained corroboration of Garbutt's claims. Shelton also contends that the government's failure to disclose how these documents were obtained prior to trial violated the government's obligations under *Brady* and *Giglio*, and put her at a severe disadvantage going into the trial.

The government counters that, even if Shelton had a reasonable expectation of privacy in her office and desk against intrusions by Garbutt, the search warrant would still have been issued even if the documents obtained by Garbutt were excised from the warrant application. In any case, the government continues, any error in admitting the evidence was harmless because the remaining evidence against Shelton was over-whelming. The government denies any error under *Brady* or *Giglio*, and maintains that the source of the documents should have been obvious to Shelton prior to the trial.

The parties agree that evidence discovered pursuant to a warrant will be inadmissible if the warrant was secured from a judicial officer through the use of illegally acquired information. *United States v. Scott*, 731 F.3d 659, 664 (7th Cir. 2013); *United States v. Oakley*, 944 F.2d 384, 386 (7th Cir. 1991). Nevertheless, a search warrant that has been obtained, in part, with evidence which is tainted can still support a search if the

untainted information, considered by itself, establishes probable cause for the warrant to issue. *Scott*, 731 F.3d at 664; *United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005); *Oakley*, 944 F.2d at 386. *See also United States v. Karo*, 468 U.S. 705, 719 (1984) (unlawfully obtained information included in a warrant affidavit would invalidate the warrant if it was critical to establishing probable cause for the issuance of the warrant, but if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid). "In assessing whether the results of the subsequent search must be suppressed, we consider two questions: (1) whether the illegally obtained evidence affected the judge's decision to issue the warrant; and (2) whether the decision to seek the warrant was prompted by information unlawfully obtained." *Scott*, 731 F.3d at 664; *United States v. Markling*, 7 F.3d 1309, 1315–16 (7th Cir. 1993).

The first question we must address is how much "untainted" information remains after we excise from the warrant application any information obtained unlawfully. On this record, that turns out to be a tricky question, but in the end the answer is that very little remains if we exclude evidence gathered as a result of Garbutt's unlawful searches, and it is not enough to support the warrant. The government supplied a proposed redacted warrant application that blacked out most of the references to the documents that Garbutt retrieved from Shelton's office.[11] The remaining material on which the

---

[11] The government appears to have missed a relevant redaction in paragraph 30 of the warrant affidavit. R. 234-6, at 19. That paragraph refers

(continued...)

government relies to establish probable cause consists of (1) statements from Garbutt about his observations and conversations at the Trustee's Office, (2) quotations from undercover recordings made by Garbutt, and (3) the observations of FBI agents who confirmed that Shelton was present at a print shop and at a venue for a fundraiser during the work day on days when Garbutt said she would be there. In response to Shelton's argument that Garbutt's document collection provided the corroboration that established trust between the informant and the Agent, the government asserts that some of the recordings were made before Garbutt began to collect physical documents from the office. But the government does not cite or provide any specific recordings that corroborated Garbutt's accusations prior to the document collection.[12]

---

[11] (...continued)
to a list kept by Shelton at her work desk and provided to Agent Holbrook of employees in the Trustee's Office who contributed to fundraisers for Elgin. That list is referenced again in paragraph 59, which the government removes in its entirety in the redacted version of the warrant affidavit.

[12] The record on appeal does not include any of the recordings that Garbutt made, which apparently are on physical discs that were not uploaded to the electronic docket and not physically delivered to the court of appeals. The record contains a selected list of source reporting documents summarizing contacts between Garbutt and Agent Holbrook. That list begins on August 14, 2013, several months after the investigation began. R. 234-4. Again, the government did not cite or supply the recordings that it asserts preceded the collection of evidence. The first recording cited in the warrant application was made in September 2013, months after Garbutt began collecting documents.

Shelton counters that Agent Holbrook did not provide the recording equipment until Garbutt produced documents from the office, citing Garbutt's own testimony to that effect. *See* R. 257, at 210 (where Garbutt testified that, after becoming an informant and before recording, he gathered documents from and took photographs of his co-workers' offices at Holbrook's request); R. 257, at 214 (where Garbutt affirmed that he collected documents and information for Holbrook and then began recording his co-workers in the latter part of 2013). According to Shelton, this demonstrates that the recordings were tainted by the unlawful document collection. Because the government can cite no evidence contrary to the statements of its own star witness, we must agree.

We thus conclude that wrongfully collected evidence influenced every aspect of the investigation that Agent Holbrook subsequently conducted. Recall that when Garbutt first approached the FBI, Agent Holbrook knew nothing about him and was unaware of any problems at the Trustee's Office. Although he conducted a criminal background check on Garbutt, Agent Holbrook had little basis to assess Garbutt's credibility regarding his claims of unlawful activity at the Trustee's Office. At first Garbutt supplied documentary evidence only from his own computer, implicating only himself in criminal activity. As Shelton argued, Garbutt established his credibility with Agent Holbrook by complying with the Agent's directive to conduct searches of his co-workers' offices and providing to the Agent documents that corroborated the accusations that he was making against his co-workers. The warrant application itself is replete with examples of Holbrook noting how Garbutt corroborated his

claims against his co-workers by supplying documents that Garbutt collected from the office. But probable cause must come before a search, and cannot be established retroactively by the results of the search. Moreover, this is not a situation where there is any attenuation between the unlawful search and the obtaining of the warrant, or any independent source of the information. This was a continuous course of conduct that stretched over a multi-month period, culminating in the warrant application; Garbutt was the only source. The unlaw-fully obtained evidence thus affected the judge's decision to issue the warrant. *Scott*, 731 F.3d at 664.

We turn to the second question which we may answer in short order. Agent Holbrook's testimony at trial made clear that he would not have sought the warrant without the materials he obtained from Garbutt. After establishing that Agent Holbrook sent Garbutt into Shelton's office without a warrant to collect documents, defense counsel questioned Agent Holbrook at trial about the process of obtaining the warrant that led to the discovery of evidence admitted at trial:

> Q. Now, did you seek any kind of judicial permis-sion before you sent Mr. Garbutt in to look in other people's offices?
>
> A. No.
>
> Q. Subsequently, you – presumably, based on what you gathered from Mr. Garbutt, you did seek judicial permission to go into the offices; is that right?
>
> A. Yes.

Q. And that was done in March of 2013?

A. Yes.

Q. And without Mr. Garbutt and the information
    that he collected for you, you would not have
    been in a position to do that; is that correct?

A. Correct.

R. 258, at 81.[13]

Without the documents and recordings that Garbutt
obtained as an agent of law enforcement, Agent Holbrook had
little basis to seek a warrant. Absent corroboration of Garbutt's
claims about his co-workers, Holbrook had little more than the
say-so of an informant of questionable credibility, who was
admittedly deep into criminal activity and had a strong
incentive to provide (or even manufacture) information
implicating others in order to receive lenient treatment for
himself.[14] The FBI's observations of Shelton at certain locations
where Garbutt predicted she would be present added little to
the mix. We agree with Agent Holbrook, who candidly

---

[13] The search warrant was obtained and executed in March 2014, not March
2013. Presumably defense counsel misspoke when she cited 2013 as the year
that the warrant was obtained, and Agent Holbrook did not notice the
mistake. The error is not relevant to the outcome here. There was only one
warrant at issue, the March 2014 warrant.

[14] Recall that Garbutt was aware that George Van Til, another local official,
was charged with federal crimes for similar conduct, and had cited Van Til
as one of his reasons for coming forward. Garbutt had also had a falling out
with Elgin that resulted in significant reductions in his status, salary, and
benefits.

conceded that he would not have been in a position to seek a warrant without the information that Garbutt provided in his capacity as an agent of the government. The evidence gained from the warrant and presented at trial was therefore the fruit of the initial, multi-month unlawful search, and should have been suppressed.

Improper admission of evidence does not require reversal if the error was harmless. *United States v. Chaparro*, 956 F.3d 462, 481 (7th Cir. 2020). An evidentiary error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999). *See also United States v. Thornton*, 642 F.3d 599, 605 (7th Cir. 2011) ("In determining whether an evidentiary error is harmless, we consider whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded."). We may affirm if the error did not substantially influence the verdict because other untainted incriminating evidence is overwhelming, as the government claims here. *Chaparro*, 956 F.3d at 482.

Under that standard, the error here cannot be characterized as harmless. Indeed, the tainted evidence shaped the entire trial. It provided corroboration for the testimony of the government's star witness, Stafford Garbutt, a man with suspect motives and significant credibility problems. Garbutt, who was deeply involved in the charged conduct, had an incentive to implicate his former co-workers in order to avoid criminal liability himself. From his own testimony, it was also apparent that Garbutt's formerly intimate relationship with Elgin had suffered a significant rupture that included name-calling,

demotion, a reduction in salary and the loss of perquisites. The remaining evidence cannot be fairly described as overwhelming. Shelton's motion to suppress and motion for a mistrial should therefore have been granted.[15] We vacate her conviction and remand for proceedings consistent with this opinion.

## C.

For the sake of completeness, and to the extent that anything remains for retrial following the suppression of the evidence procured through the tainted warrant, we will address Shelton's claims that there was insufficient evidence to convict her of either conspiracy to commit wire fraud or conspiracy to commit honest services wire fraud. Although she framed the arguments as founded on insufficiency of the evidence, Shelton also argues that neither count was pleaded or proved under a valid legal theory. According to Shelton, there was insufficient evidence to support Count I, which charged a conspiracy to commit wire fraud based on the use of government employee time to engage in campaign activities, because the evidence showed that the employees completed the campaign work in addition to rather than instead of their regular duties. Shelton also portrays Count I as an attempt to make out an honest services wire fraud claim through the back door after *Skilling v. United States*, 561 U.S. 358 (2010), limited honest services cases to bribery and kickbacks. As for Count VI, Shelton asserts that there was insufficient evidence to demonstrate that there was any agreement to engage in a

---

[15] Because we have concluded that a significant part of the evidence against Shelton should have been suppressed and her motion for mistrial granted, we need not address her additional arguments under *Brady* and *Giglio*.

bribery or kickback scheme, and instead the government was making a legally insufficient proof based on the use of government time and resources for campaign work, a theory that she asserts is invalid under *Skilling* and under *Kelly v. United States*, 140 S. Ct. 1565 (2020).

**1.**

Count I charged Shelton, along with Elgin, Wheeler and Elgin's son Hunter, with conspiring to commit wire fraud. R. 1, at 4. The object of the conspiracy was:

> to obtain money and property of CTTO [Calumet Township Trustee's Office], by using the time, resources and employees of CTTO to further the personal and political interests of MARY ELGIN, ETHEL SHELTON, STEVEN HUNTER, and ALEX WHEELER, rather than to benefit the citizens of CTTO.

R. 1, at 4. Specifically, the government asserted that the defendants used public employees and Township resources (such as computers, printers and storage space) to run campaign fundraisers and other campaign activities during regular work hours while paying those employees with Township funds.

Whether there was sufficient evidence to prove this scheme with the evidence presented at the trial is no longer at issue because a large part of that evidence should have been excluded. But this was a viable legal claim as charged and as the government argued it at trial. Although honest services wire fraud covers only bribery and kickback cases, regular wire

fraud cases may be brought when the object of the conspiracy is to obtain money or property. *Kelly* made clear that, to prove "money or property" wire fraud, the government must demonstrate that obtaining the money or property was not simply the byproduct of a fraudulent scheme but rather was the very object of the fraud. *Kelly*, 140 S. Ct. at 1573.

In *Kelly*, the government sought to prove wire fraud in a scheme where the defendants, who were state government employees, closed three of four bridge lanes in order to punish the mayor of the city whose inhabitants used those lanes in retaliation for the mayor not supporting a particular gubernatorial candidate. As cover for the bridge scheme, the defendants used government employees to conduct a sham traffic study and to provide a backup toll collector for the single remaining lane. The government charged a wire fraud scheme based in part on the use of salaried employees to conduct the sham traffic study and cover the toll collection. The Court rejected the government's wire fraud theory based on those employee salaries because the defendants were not seeking to obtain the services those employees provided. That is, they did not care about the traffic study or providing the backup toll collector. These implementation costs were not the object of the bridge scheme but were simply the byproduct of the true object of the scheme. *Kelly* 140 S. Ct. at 1573–74. In other words, "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Kelly*, 140 S. Ct. at 1573.

The Court made clear, however, that a "government's right to its employees' time and labor, by contrast, can undergird a property fraud prosecution." *Kelly*, 140 S. Ct. at 1573. As

examples of valid money-or-property wire fraud claims, the Court cited cases where a mayor used deception to get on-the-clock employees to renovate his daughter's new home, and where a city parks commissioner induced his employees into doing gardening work for political contributors. *Id*. In each of those cases, "the cost of those employees' services would qualify as an economic loss to a city, sufficient to meet the federal fraud statutes' property requirement." *Id*. The loss to the victim in each of those schemes, the Court noted, was not an incidental byproduct of the scheme but rather was the object of the schemes. "The entire point of the fraudsters' plans was to obtain the employees' services." *Id*. In contrast, in the bridge fraud scheme, the object was political retaliation, and the cost of employee labor to provide cover for the scheme was the cost of implementing that scheme, a mere byproduct of the scheme itself.

The scheme charged here fits comfortably into the paradigmatic cases that the Court described as legitimate money-and-property wire fraud in *Kelly*. If the object of the charged scheme in Count I was to obtain the services of on-the-clock government employees to run political campaigns that benefitted Elgin, Shelton and Wheeler, then the labor costs of this plan were not a byproduct of the scheme; they were the object of the scheme. The government essentially alleged that Elgin, Shelton and Wheeler were using Township staff to run their campaigns on government time while using government resources. It did not matter to the money-or-property wire fraud conspiracy charge that the campaign work itself also involved a possible kickback scheme; all that mattered for this count was that the defendants were alleged to be using

government employees on government time to benefit their
own personal interests rather than to attend to their govern-
ment jobs. The government presented evidence, for example,
that an information technology employee in the Trustee's
Office spent a week helping Shelton with technology issues
related to campaign tasks. There was also evidence that
campaign banners and flyers were printed using Trustee's
Office printers. Several employees engaged in campaign tasks
throughout the workday. That said, the jury acquitted Wheeler
even when presented with the evidence that we have now
concluded should have been excluded. It is impossible to
predict what a jury would find if presented with the scaled-
down version of the evidence now available to the government
to prove Shelton's charged participation in a scheme to use
government employees to conduct non-government work, and
we offer no opinion on the subject.

**2.**

Count VI charged Shelton, Elgin, Hunter and Wheeler with
conspiracy to commit honest services wire fraud. The indict-
ment described the scheme as depriving the citizens of
Calumet Township of their right to the honest and faithful
services of the defendants through the solicitation and pay-
ment of bribes and kickbacks in the form of campaign ticket
payments and forced political work. Specifically, the object of
the conspiracy was for:

> the Defendants to use their official authority within
> CTTO, to obtain money and property through the
> solicitation and receipt of bribes and kickbacks from
> CTTO employees. These bribes and kickbacks

consisted of the Defendants requiring 1) a partial return of the employee's salary in the form of campaign fundraising ticket purchases for ELGIN and EPIC, ELGIN'S political fundraising committee controlled by ELGIN and 2) requiring political work to be done by CTTO employees on CTTO time for ELGIN and EPIC; and depriving CTTO and the citizens of Calumet Township of their right to the honest and faithful services of the Defendants.

R. 1, at 11. The indictment noted that, prior to Elgin's election, the previous trustee expected his employees to kick back two percent of their salary as a condition of being hired or retained in their jobs. Elgin instead sought to obtain kickbacks of employee salary indirectly in the form of purchases of fundraising tickets and forced engagement in political work on Elgin's behalf. The dollar amount of tickets that each employee was expected to purchase was related to a percent of salary, ranging from one half to one and a half percent, depending on the employee's wages. The indictment charged that the defendants forced the employees to purchase tickets or engage in campaign work on behalf of Elgin under threat of possible retaliation in some aspect of their jobs if they failed to do so. According to the indictment, the defendants "used their official authority to threaten or retaliate against employees who did not kick back a portion of their salary through the purchase of campaign tickets or who refused to do campaign work" for Elgin and her political action committee, EPIC. R. 1, at 12.

Shelton raises wide-ranging arguments regarding the honest services count, from factual insufficiency to legal insufficiency. She contends, for example, that the evidence was

insufficient to demonstrate that she joined any agreement to solicit bribes or kickbacks, and that, under *Skilling*, the salaries of employees used for campaign work is insufficient to support an honest services wire fraud conviction. As with the other wire fraud count, a diminished body of evidence is now available for the prosecution at any retrial on this count. We therefore focus on the legal theory that the government pressed for the honest services count. Shelton is correct that there were some problems with the government's honest services legal theory as pleaded and proved at trial.

As we noted above, *Skilling* limits honest services wire fraud cases to those involving bribery and kickbacks. Although the government sought to charge and prove a kickback case, it defined the object of the scheme as a hybrid of a *Skilling* honest services case and a money-or-property wire fraud case. It described the honest services scheme as (1) requiring a partial return of salary in the form of the purchase of campaign fundraiser tickets, and (2) requiring political work to be done by Township employees *on Township time*. R. 1, at 12. In both instances, the indictment alleged that the defendants used their official authority to "threaten or retaliate" against employees who did not pay for tickets or "volunteer" to work on the campaign fundraisers during work hours. Kickbacks, the court correctly instructed the jury, involve the exchange of a thing of value for official action by a public official. R. 327, at 31.

There are a few potential problems with how the government charged and sought to prove this count. First, the indictment charged the "thing of value" as payments for tickets and forced campaign work on Township time, with an emphasis on the work being done on Township time. Although

forced campaign work might be a "thing of value" supporting a kickback charge, that is not how the government presented the case, instead emphasizing that the work was done on the taxpayers' dime. There was no evidence, for example, of an agreement to base layoff or retention decisions on whether an employee worked on the campaign, regardless of whether that labor was done on government time or on the employee's own time. The government's emphasis in the kickback claim regarding forced campaign work was instead simply that it was conducted on government time. But *Kelly* made clear that employee salaries that were the byproduct of a fraudulent scheme could not support an honest services charge. In the ticket-selling kickback scheme, employee labor was not the object of the scheme; it was the byproduct of running the scheme.

A legally viable honest services conspiracy would have involved an agreement to accept a kickback of a percent of salary through fundraising ticket purchases in exchange for the official act of allowing compliant employees to retain their jobs during the various layoffs that occurred under budget pressures. And this was certainly one theory that the government pressed in the indictment and during the trial. The government might also have proved that the defendants agreed to accept kickbacks in the form of campaign labor from employees in order to retain their jobs, again requiring a thing of value in exchange for an official act, but there was no evidence of such an agreement. Instead, in the forced "volunteer" work part of the count, the government went beyond the limits of *Skilling* by arguing that employee salaries that were a byproduct of a

fundraising kickback scheme could support an honest services wire fraud charge.

And that leads to another objection that Shelton has to the government's honest services case. Although she acknowledges that fundraising tickets were packaged and marketed to employees, and some employees believed that their jobs depended on purchasing tickets, she contends that there was no evidence to prove that any of the conspirators actually intended to take any official action against persons not purchasing tickets. Indeed, in one recorded conversation presented to the jury, the defendants discussed the difficulty of compelling employees to buy tickets when the employees did not believe that Elgin could not retaliate if they failed to do so. The defendants were left to strategize over how they could imply that there would be consequences for employees failing to buy the tickets. If the defendants had no intention of carrying through on the implied threats—in other words, that they did not intend to take any official action—that raises the possibility that the victim of the scheme was not the Township but the employees.

We addressed this scenario in *United States v. Hawkins*, 777 F.3d 880 (7th Cir. 2015). In that case, the defendants were analysts employed by the Cook County Board of Review, an agency that decides the claims of property owners who believe that their assessed valuations (and therefore their property taxes) are excessive. An undercover agent paid the defendants to arrange for lower assessments, and the assessments were in fact reduced except for one property where the challenge was untimely. Charged with honest services wire fraud, the defendants asserted that, although they took the money, they

did nothing in exchange for the cash and intended only to deceive the payor. In other words, they never took an official act in exchange for the money and never intended to do so. The payment was not so much a bribe, then, as a gratuity. Although this was fraud, we concluded that it was not *honest services* wire fraud because an "agent's secret receipt of a gratuity … does not violate § 1341, for a payment that does not entail a plan to change how the employee or agent does his job is neither a bribe nor a kickback." *Hawkins*, 777 F.3d at 882. In other words, accepting money to be rewarded for an official position is not enough to meet the definition of bribery under *Skilling* unless the money is taken "in exchange for" an official act. 777 F.3d at 883. This is not to say that proof of a completed exchange is essential to an honest services conviction because a "*plan* to take money in exchange for an official act constitutes a scheme to defraud, whether or not the plan succeeds." 777 F.3d at 883–84. The question is whether there was evidence of such a plan here, or whether the defendants were merely creating an impression with employees that there would be consequences for non-payment. Although this conduct would be unlawful, it would not constitute honest services fraud unless the defendants intended to take official acts such as retaining employees who paid for their tickets or laying off employees who did not pay up.

Shelton contends that there was insufficient evidence to prove that she joined a scheme for kickbacks in exchange for official action. She points out that the Township was undergoing extensive layoffs due to budgetary constraints, and a significant number of people lost their jobs during Elgin's incumbency, including some who purchased tickets. There was

evidence, though, that Shelton maintained lists of employees who purchased tickets and employees who did not. Although candidates were required to track and report donations, tracking employees who did **not** pay up was not required and this provides some evidence that non-compliant employees were targeted at layoff time. There was also testimony from an employee in the department run by Elgin's son who was terminated after she refused to purchase tickets. We offer no opinion on whether enough evidence remains to sustain an honest services wire fraud conviction on any retrial, but the district court must ensure that the government's case does not stray beyond the constraints of *Skilling*, *Kelly*, and *Hawkins*. Given how the government presented and argued the case, it is possible that the jury relied on a theory that contravened those cases.

### III.

In sum, we conclude that the district court erred when it found that Shelton lacked any reasonable expectation of privacy in her office. For the reasons stated, Garbutt's document collection, undertaken at the direction of the FBI, violated her Fourth Amendment rights. Moreover, we conclude that the warrant would not have issued in the absence of the information gathered as a result of the unlawful searches. The district court should have suppressed the evidence obtained from the search authorized by that warrant, and granted Shelton's motion for a mistrial. We reverse Shelton's convictions and remand for proceedings consistent with this opinion.

REVERSED AND REMANDED.