RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0478p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

    *v.*

No. 03-6329

GREGORY SULLIVAN,

    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 02-00045—Jennifer B. Coffman, District Judge.

Argued: April 28, 2005

Decided and Filed: December 20, 2005

Before: SUHRHEINRICH, BATCHELDER, and GIBSON, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** William K. Fulmer II, Florence, Kentucky, for Appellant. Laura K. Voorhees, ASSISTANT UNITED STATES ATTORNEY, Covington, Kentucky, for Appellee. **ON BRIEF:** William K. Fulmer II, Florence, Kentucky, for Appellant. Laura K. Voorhees, ASSISTANT UNITED STATES ATTORNEY, Covington, Kentucky, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

---

## OPINION

    JOHN R. GIBSON, Circuit Judge. Gregory Sullivan appeals his convictions on two counts of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d), two counts of use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924 (c)(1)(A)(ii), and ten counts of bank robbery in violation of 18 U.S.C. § 2113(a). Sullivan argues that the district court erred by denying his motion to appoint substitute counsel, failing to direct a verdict in his favor on three of the robbery counts, and denying his motion to suppress eyewitness identification evidence obtained through an unduly suggestive photo lineup. He further argues that the Government failed to disclose exculpatory evidence in violation of its obligation under *Brady v. Maryland*, 373 U.S.

---

[*]The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1

83 (1963), and he seeks relief for alleged ineffective assistance of counsel. We affirm the district court[1] in all respects.

In 2002 Sullivan was indicted in connection with a string of twelve bank and credit union robberies in northern Kentucky resulting in losses totaling $107,425. Although the first robbery had occurred on October 11, 2000 at the Columbia Federal Savings Bank in Florence, Kentucky, it was the robbery of the Heritage Bank in Fort Wright, Kentucky on June 11, 2002, that first implicated Sullivan as a suspect in the robberies. According to eyewitnesses and bank surveillance video photographs, the robber entered the Heritage Bank, announced the robbery, ordered the male employees to sit on the floor, and demanded money from the female tellers. After receiving approximately $11,000, the robber ordered the tellers to the ground and fled.

Investigators collected an array of evidence linking Sullivan to the Heritage Bank robbery. First, the bank manager, Christopher Caddell, testified that he saw the robber fleeing in a 1990 to 1995 turquoise or aqua-green Chevrolet Camaro Z-28, and later identified a photograph of the blue 1995 Chevrolet Camaro Z-28 owned by Sullivan's current wife as the car used in the getaway. Second, a fingerprint left by the robber matched Sullivan's. Third, bait money taken during the robbery came back to the bank through deposits suggesting Sullivan's involvement in the robbery. Last, bank surveillance video photographs and eyewitness accounts depicted the suspect wearing a burgundy or maroon baseball hat with a gold letter "B" like that found on the uniform hat for the Bluegrass Baseball Club, which had issued Sullivan's son a uniform.

During the course of investigating the Heritage Bank robbery, detectives learned that several northern Kentucky banks and credit unions had been robbed by suspects with similar descriptions to that of the Heritage Bank robber.[2] During interviews with eyewitnesses to these robberies, fifteen individuals identified Sullivan as the robber from a photographic array.[3] Based upon this information, officers executed a warrant to search the blue Camaro Z-28 registered to Sullivan's wife, which uncovered caps, sunglasses, a scarf/bandana, various shirts, jackets, carpet fiber, financial records, and currency. Following the search, Sullivan was placed under arrest and later indicted by a federal grand jury on two counts of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d), two counts of use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924 (c)(1)(A)(ii), and ten counts of bank robbery in violation of 18 U.S.C. § 2113(a).

---

[1]The Honorable Jennifer B. Coffman, District Judge, Eastern District of Kentucky at Covington.

[2]The robberies were charged as follows:
Count 1, 12/17/99, Columbia Federal Savings Bank, Florence, KY, $9,679.00
Count 3, 10/11/00, Columbia Federal Savings Bank, Florence, KY, $4, 216.00
Count 4, 10/25/00, PNC Bank, Union, KY, $9,343.00
Count 6, 2/27/01, First Security Bank, Edgewood, KY, $1,949.00
Count 7, 3/14/01, Provident Bank, Cold Springs, KY, $5,209.00
Count 8, 5/11/01, C & O United Credit Union, Edgewood, KY, $ 21,430.00
Count 9, 8/31/01, PNC Bank, Taylor Mill, KY, $12,426.00
Count 10, 10/26/01, C & O United Credit Union, Edgewood, KY, $14,613.00
Count 11, 12/6/01, Park Federal Credit Union, Florence, KY, $5,275.00
Count 12, 1/25/02, PNC Bank, Edgewood, KY, $7,535.00
Count 13, 5/17/02, Firstar Bank, Fort Wright, KY, $3,932.00
Count 14, 6/11/02, Heritage Bank, Fort Wright, KY, $11,819.00.

[3]In addition to identifying Sullivan as the robber in the photographic array, a number of eyewitness identified him as the robber at trial.

Sullivan, represented by appointed counsel, pled not guilty to the second superseding indictment. Counsel filed a number of pre-trial motions, including a motion to suppress the out-of-court eyewitness identifications, which the district court denied following an evidentiary hearing. At trial, the jury convicted Sullivan on all fourteen counts of the superseding indictment. Sullivan was sentenced to 572 months in prison and ordered to pay $107,425 in restitution. This appeal followed.

**I.**

Sullivan contends that the district court erred by denying his motion to substitute counsel filed *pro se* on the fifth day of his trial. The decision as to whether to appoint new counsel at the defendant's request is committed to the sound discretion of the district court. *United States v. Trujillo*, 376 F.3d 593, 606 (6th Cir. 2004). The denial of a motion to substitute counsel will be reversed only upon an abuse of that discretion. *United States v. Williams,* 176 F.3d 301, 314 (6th Cir. 1999).

"An essential element of the Sixth Amendment's protection of the right to assistance of counsel is that a defendant must be afforded a reasonable opportunity to secure counsel of his own choosing." *Linton v. Perini*, 656 F.2d 207, 209 (6th Cir. 1981) (internal quotations and citation omitted). However, the right to counsel of one's choosing is not absolute. *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990). "When an accused seeks substitution of counsel mid-trial, he must show good cause such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his attorney in order to warrant substitution." *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985). In reviewing the district court's denial of a motion to substitute counsel we generally consider:

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001); *see also Iles*, 906 F.2d at 1130 n. 8.

In this case, we conclude that the district court was well within its discretion as to each of the four factors. First, and most significantly, Sullivan's motion was untimely. He filed his *pro se* motion on the fifth day of his trial, after the Government had presented the testimony of forty-two witnesses and had rested its case, and after the district court had denied Sullivan's motion for judgment of acquittal. In the absence of a showing of good cause for the substitution, we have found motions to substitute counsel filed far earlier than this to be untimely. *See, e.g.*, *Trujillo*, 376 F.3d at 606-607 (motion to substitute three days before scheduled start of trial untimely); *Williams*, 176 F.3d at 314 (motion to substitute made two weeks before trial untimely); *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996) (motion to substitute counsel made the day before trial untimely).

Much of Sullivan's contention that the district court's refusal to appoint substitute counsel was an abuse of discretion rests on the second factor—the adequacy of the court's inquiry into his reason for seeking new counsel. Sullivan's *pro se* motion to dismiss counsel recited that "current counsel is causing the Defendant to not be properly represented in this case" and that "Defendant can no longer work with [trial counsel] on this case." However, the motion failed to indicate any particular reason for Sullivan's dissatisfaction. Finding no grounds for appointing substitute counsel

at such an advanced stage of the proceedings, the district court denied the motion.[4]  Relying on *United States v. Iles*, Sullivan argues that the district court failed to discharge its affirmative duty to determine the reasons why Sullivan desired new counsel.  906 F.2d at 1130 ("[W]hen an indigent defendant makes a timely and good faith motion requesting that appointed counsel be discharged and new counsel appointed, the trial court clearly has a responsibility to determine the reasons for defendant's dissatisfaction with current counsel.") (citation omitted).

When viewed in the overall context of the trial, we conclude that the district court adequately discharged its duty to conduct an inquiry under *Iles* in that "[t]he need for an inquiry will not be recognized . . . where the defendant has not evidenced his dissatisfaction or wish to remove his appointed counsel."  *Id.* at 1131; *see also Mack*, 258 F.3d at 556.  Trial counsel filed his own motion to withdraw on the Friday before the trial was to commence on Monday.  During a hearing on the motion to withdraw on Monday morning, Sullivan unequivocally indicated to the court that he wanted trial counsel to continue to represent him and that everything had been "straightened out."[5] Accordingly, counsel withdrew his motion and the trial proceeded.  Sullivan's *pro se* motion to dismiss counsel set forth no grounds for why new counsel should be appointed, which prompted the district court to deny it in light of the late stage of the trial and in reliance upon what appeared to have been a resolution of their differences four days earlier.  We conclude that the district court's inquiry into Sullivan's dissatisfaction with counsel was not so deficient as to make its denial of Sullivan's motion an abuse of discretion.

As to the third factor, the extent of the conflict between Sullivan and trial counsel, we conclude that the district court did not abuse its discretion by failing to find a total lack of communication between Sullivan and his attorney.  To be sure, the record clearly demonstrates "that there was some lack of understanding or lack of confidence" between Sullivan and his lawyer.  *Williams*, 176 F.3d at 314.  As discussed above, trial counsel had moved to withdraw on the eve of

---

[4]The colloquy between the district court and trial counsel on the motion was as follows:

THE COURT: I have received a copy of a – what is called a motion to dismiss defense counsel filed by Gregory Sullivan, pro se.  Mr. Neff, were you aware this motion was filed?
MR. NEFF: Your Honor, last night after court my client presented it to me and asked me to file it with the Court.
THE COURT:  All right.
MR. NEFF:  So pursuant to his directions, I have done that.
THE COURT:  All right.  The motion is denied.  We addressed this once earlier.  I asked the defendant directly whether – whether you have resolved your differences.  He said yes.  The trial has proceeded.  I see no grounds for the motion, and so I'm denying your motion.

[5]The discussion between the court, trial counsel, and Sullivan was as follows:

THE COURT: . . . Mr. Sullivan, were you aware that Mr. Neff had filed a motion to withdraw as your counsel on Friday?
DEFENDANT GREGORY SULLIVAN: Yes, I was, Your Honor.
THE COURT:  Do you wish for him to withdraw?
DEFENDANT GREGORY SULLIVAN:  No, Your Honor.
THE COURT:  You don't?
DEFENDANT GREGORY SULLIVAN:  No, Your Honor.
THE COURT:  Okay.
DEFENDANT GREGORY SULLIVAN:  We have got that straightened out.
THE COURT: You have gotten that straightened out?
DEFENDANT GREGORY SULLIVAN:  Yes, ma'am.
THE COURT: All right. Mr. Neff, do you agree?  You may sit down, Mr. Sullivan.
DEFENDANT GREGORY SULLIVAN:  Okay.
THE COURT:  Mr. Neff, do you agree, and accordingly do you withdraw your motion to withdraw?
MR. NEFF: Your Honor, I do agree, and I will withdraw my motion to withdraw.
THE COURT:  The motion is withdrawn then.

trial, and Sullivan filed his own motion five days into the trial. Moreover, following the denial of his motion to substitute counsel, Sullivan moved to conduct his own closing arguments on the grounds that he "d[id] not wish his legal counsel to present closing arguments on his behalf." However, the record does not reveal that the disagreements between attorney and client in this case rose to the level of a conflict sufficient to justify substitution of counsel mid-trial. Sullivan was required to make "a showing of more than communication with counsel which the defendant feels is unsatisfactory." *Jennings*, 83 F.3d at 149. Sullivan needed to demonstrate that the attorney-client relationship had so deteriorated that it "resulted in a total lack of communication preventing an adequate defense." *Id.* The record indicates that Sullivan and his counsel continued to communicate. They conferred regarding Sullivan's decision to testify on his own behalf. While Sullivan was still considering that decision, he directed trial counsel to move for a continuance in order for Sullivan to compose himself to testify and have an opportunity to interview more witnesses. Because the record indicates that there was not a "complete breakdown in communication" between Sullivan and trial counsel, the district court did not abuse its discretion in denying Sullivan's motion for substitute counsel.

Finally, the district court did not abuse its discretion in denying Sullivan's motion to substitute counsel because "the public's interest in the prompt and efficient administration of justice" weighed strongly in favor of its decision. First, the sheer untimeliness of Sullivan's motion for substitution would have frustrated the prompt and efficient administration of justice in the absence of good cause to support the substitution. Second, Sullivan's continued representation by trial counsel actually promoted the prompt and efficient administration of justice in light of trial counsel's background and work on the case thus far. Finally, the record does not reflect that the prompt and efficient administration of justice would have been served by the substitution of counsel and the attendant continuance such a substitution would have required in light of the costs and effort related to the jury trial, which included forty-two government witnesses. As each of the four relevant factors weighed in favor of Sullivan's continued representation by trial counsel, we find no abuse of discretion and affirm the district court's denial of Sullivan's motion.

## II.

Sullivan contends that there was insufficient evidence from which a reasonable juror could have found him guilty on Counts 8 through 10 of the indictment. These counts charged Sullivan with three unarmed bank or credit union robberies in violation of 18 U.S.C. § 2113(a): the May 11, 2001, robbery of the C & O United Credit Union in Edgewood, Kentucky; a second robbery of the C & O United Credit Union on October 26, 2001; and the August 31, 2001, robbery of the PNC Bank in Taylor Mill, Kentucky. To sustain a conviction under 18 U.S.C. § 2113(a), the jury was required to find that Sullivan intentionally took money from another person, that the money was then in possession of a federally insured bank or credit union, and that Sullivan took the money by force, violence, or intimidation. The crux of Sullivan's argument is that the government failed to present sufficient evidence from which a reasonable juror could conclude that Sullivan, as opposed to someone else, committed these robberies.

At the outset, we note that Sullivan bears a heavy burden to establish that there was insufficient evidence to support his convictions. *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998); *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir. 2000). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Kelly*, 204 F.3d at 656 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In undertaking this analysis, we neither independently weigh the evidence, nor judge the credibility of witnesses who testified at trial. *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999). We examine the evidence in the light most favorable to the convictions and draw all inferences in the government's favor. *Maliszewski*, 161 F.3d at 1005.

Viewed in the light most favorable to the government, the evidence at trial supporting the jury's guilty verdict on Counts 8 through 10 was as follows. Teller Bonnie Pittman was present during the robbery and testified as to the accuracy of the surveillance photos taken at the time. During the robbery she was able to get a good look at the robber's profile, the shape of his head, and his body structure. She described the robber as a man who was slouched over, wearing a striped shirt and a dark baseball cap, with his hand in his shirt and with a mask over his face. Although at trial Pittman could not identify Sullivan as the robber, she testified that she had picked Sullivan out of a photo lineup during the investigation.

Paula Hopkins, a credit union customer present during the robbery, also testified at trial. The robber ordered her to the ground and, after receiving money from the tellers, ordered her and the tellers into a back room. She observed the robber during the entire robbery, was able to make eye contact with him twice, and was able to see his eyes and his hair. Hopkins identified Sullivan as the robber at trial and testified that she had identified Sullivan as the robber from a photo lineup at the suppression hearing.

Teller Emily Roth was present during both robberies of the C & O United Credit Union. Like Pittman, she described the May 11, 2001, robber as a man wearing a dark colored hat and whose face was partially covered by a bandana. She similarly described the October 26, 2001, robber as a man wearing a dark hat and a bandana who was hunched over to disguise his height. On both occasions she was able to see the robber's eyes to the top of his nose and the side of his face. Although during the investigation Roth had been able to identify Sullivan from out of a photo spread as the robber on both occasions, she was unable to identify him as the robber at trial. However, she did testify that the same individual had committed both robberies because on both occasions the robber wore a baseball hat and bandana, his voice was the same, he acted the same and he "handled" both robberies in the same way in that "he wanted all the same type of money, [and] he wanted us to get in the back room, but then he changed his mind."

Two employees testified about the robbery of the PNC Bank in Taylor Mill, Kentucky. Teller Kara Fields testified that she was running a transaction on the day of the robbery when she looked up from the teller counter and saw the robber standing in front of her. He demanded all of her cash and told her that he had a gun. During the robbery, the robber was standing about two feet away from her teller window and she got a good opportunity to see his face from the nose upwards. She described the robber as a man with what appeared to be a shirt pulled up over his mouth and wearing a green and light brown plaid shirt.[6] At trial, Fields identified Sullivan as the robber and testified as to the accuracy of the surveillance photos taken during the robbery. Judie Lea, manager of the PNC Bank, testified that the robber covered his face with a shirt and was wearing a plaid shirt. She observed the robbery's progress as best she could from her position on the floor where the robber had ordered her to lie.

Sullivan contends that this eyewitness testimony is insufficient to support his convictions because some of the eyewitnesses either did not get a "decent look" at the robber, gave conflicting descriptions of the robber's eye and hair color, or were unable to identify Sullivan as the robber in the courtroom. However, the record reveals that Sullivan's counsel conducted thorough cross-examinations of each of these eyewitnesses with the apparent intention of highlighting these inconsistencies and deficiencies. The cross-examination was a legitimate attempt to undermine the credibility of these witnesses in front of the jury. While that exercise was appropriate at trial, we decline Sullivan's invitation to substitute our judgment for that of the jury in weighing the credibility of these witnesses. *See Talley*, 164 F.3d at 996. After reviewing the evidence in the light most

---

[6]A green and brown plaid shirt taken from Sullivan's ex-wife's house that Sullivan admitted was his was introduced into evidence at trial. (App. 437-438, 907).

favorable to the prosecution, we conclude that a rational trier of fact could conclude beyond a reasonable doubt that it was Sullivan, as opposed to someone else, who committed the robberies charged in Counts 8 through 10. Accordingly, we affirm the district court's denial of Sullivan's motion for a directed verdict on those counts.

### III.

Sullivan contends that the district court's denial of his motion to suppress the government's eyewitness identification evidence violated his due process rights. He asserts that the out-of-court identifications were unduly suggestive and the in-court identifications were the fruit of the tainted and unreliable procedures. A magistrate judge conducted an evidentiary hearing on Sullivan's motion to suppress on November 6, 2002, and issued a twenty-page Report and Recommendation eight days later. Recommending the denial of Sullivan's motion, the magistrate judge put the parties on notice that a failure to file objections within ten days would result in a waiver of the right to appeal the judgment of the district court on this issue. Despite this warning, Sullivan filed no objections and on December 6, 2002, the district court entered an order adopting the magistrate judge's Report and Recommendation.

Sullivan's failure to object to the magistrate judge's Report and Recommendation constitutes a waiver of his right to appeal the admission of the identification evidence. Sullivan had ten days within which to file written objections, if any, to the magistrate's report. 28 U.S.C. § 636(b). This court has repeatedly held that a defendant *must* file such objections in order to preserve the issue for appeal. *United States v. Campbell*, 261 F.3d 628, 631-632 (6th Cir. 2001); *Thomas v. Arn*, 728 F.2d 813, 814-15 (6th Cir. 1984); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). A failure to do so results in a waiver of that issue. *Campbell*, 261 F.3d at 631-32; *United States v. Real Property Located at 1184 Drycreek Road, Granville, Ohio 43023*, 174 F.3d 720, 725 (6th Cir. 1999); *see also Thomas v. Arn,* 474 U.S. 140, 155 (1985) (upholding 6th Circuit practice against due process challenge). Here, Sullivan failed to file objections to the magistrate judge's findings with the district court and, as a result, has waived any challenge to the district court's denial of his motion to suppress the identification evidence.

Recognizing that the waiver rule is not absolute, this court has excused default "where the district court's error is so egregious that failure to permit appellate review would work a miscarriage of justice." *Real Property*, 174 F.3d at 725-26. However, our review of the record and of the magistrate judge's exhaustive report convinces us that the admission of the identification testimony against Sullivan did not work a miscarriage of justice. A district court's admission of identification testimony only violates due process when the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *United States v. Meyer*, 359 F.3d 820, 824 (6th Cir. 2004) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). This court has prescribed a two-step analysis for determining the admissibility of identification testimony. First, the defendant must show that the identification procedure was unduly suggestive. If the defendant meets this burden, then the court must evaluate the reliability of the identification in the totality of the circumstances. *Ledbetter v. Edwards,* 35 F.3d 1062, 1071-72 (6th Cir.1994).

The magistrate judge concluded that Sullivan failed to demonstrate that the photographic arrays or the procedures used to present them to the eyewitnesses were unduly suggestive. Sullivan argued that his picture was emphasized in the photographic array in that he was the only suspect in lineup with noticeably blue eyes and a majority of the witnesses described the robber as having blue eyes. Looking at the quality of the photographs and at the characteristics of the individuals in them, the magistrate judge concluded that the array did not improperly single out the defendant; indeed, the magistrate judge noted that "the eye color is not easily ascertained by looking at either array." The district court reviewed the record, giving deference to the magistrate judge's factual findings

in light of Sullivan's failure to object, and we conclude that the lower courts committed no egregious error that would warrant our review. Sullivan has waived his appeal of a due process challenge to the admissibility of the out-of-court and in-court identifications arising out of the photographic arrays because he failed to file objections to the magistrate judge's Report and Recommendations.

## IV.

Finally, Sullivan contends that the Government deprived him of due process by suppressing certain exculpatory evidence in contravention of its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963). The evidence Sullivan argues that the Government was required to disclose under *Brady* consists of discarded fiber and hair samples taken from a bandana believed to have been worn by the robber of the Heritage Bank, as well as copies of some of the suspect description forms completed by eyewitnesses shortly after the robberies.

The Supreme Court recognized in *Brady* that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Underlying the *Brady* decision was the notion that "it is fundamentally unfair for the government to achieve a conviction through the concealment of evidence which undermines the strength of the government's case against the defendant." *United States v. Presser*, 844 F.2d 1275, 1282-83 (6th Cir. 1988). To establish a due process violation under *Brady* "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). It is the defendant's burden to demonstrate that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Id*. at 289. "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'" *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991) (citation omitted). Thus, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289-90.

Sullivan has failed to make out a *Brady* violation with respect to the fiber and hair samples. Sullivan has not demonstrated that the samples were favorable to his defense. According to a letter from the Assistant United States Attorney who tried the case, she learned of the existence of the samples after the trial had concluded and was told by the investigating FBI agent that there was no root bulb on the hair sample, thereby making DNA identification impossible. Moreover, the agent had determined that in light of the contamination at the scene, a testing of the samples would have yielded nothing relevant to the case and he discarded them. Even assuming that the samples would have been favorable to Sullivan's defense, he has failed to demonstrate that he was prejudiced by their absence. We conclude that Sullivan's trial resulted in a verdict worthy of confidence in light of the overwhelming evidence connecting him to the Heritage Bank robbery, including his fingerprint, identifications by four eyewitness, bait money linked to him, video surveillance capturing the robber wearing a baseball cap identical to Sullivan's son's cap, and accounts of the robber's escape in a car that was virtually identical to the one owned by Sullivan's wife.

Likewise, Sullivan has failed to make out a *Brady* violation with respect to the eyewitness identification forms because he has presented no evidence from which we could conclude that information in the missing forms would be favorable to his defense. Sullivan fails to identify which of the twenty-eight eyewitnesses' description forms are missing, nor does he describe how the information contained in the forms could have been exculpatory. It is Sullivan's burden to demonstrate that he failed to receive a fair trial in the absence of this evidence and Sullivan has failed to discharge this burden.

## V.

On this direct appeal Sullivan also argues that we should reverse his conviction because the district court's refusal to appoint substitute counsel caused him to receive ineffective assistance of counsel. Specifically, Sullivan contends that counsel was ineffective due to counsel's purported conflict of interest and his failure to call two available alibi witnesses. The usual rule is that a defendant may not raise claims for ineffective assistance of counsel on direct appeal. *United States v. Williams*, 176 F.3d 301, 312 (6th Cir. 1999). Rather, "'[t]he more preferable route for raising an ineffective assistance of counsel claim is in a post-conviction proceeding under 28 U.S.C. § 2255,' whereby the parties can develop an adequate record." *United States v. Barrow*, 118 F.3d 482, 494 (6th Cir. 1997) (quoting *United States v. Carr*, 5 F.3d 986, 993 (6th Cir. 1993)). On occasion this court has departed from the usual rule to address the merits of an ineffective assistance of counsel claim on direct appeal, but only when the record is adequate to address the claim. *See, e.g.*, *Williams*, 176 F.3d at 312; *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995).

Here, the record is inadequate to address Sullivan's ineffective assistance of counsel claim. Without an explanation from trial counsel as to why he failed to call the alibi witness we have no basis to determine whether this decision was the result of inadequate representation or reasonable trial strategy. Likewise, although Sullivan identifies the alleged conflict of interest as between trial counsel's desire to avoid presenting perjured testimony and Sullivan's desire to testify on his own behalf, we cannot properly resolve the issue on the current record. In the absence of an adequate record, we decline to depart from the usual rule that a post-conviction proceeding under 28 U.S.C. § 2255 is the proper vehicle for a claim of ineffective assistance of counsel.

## VI.

The judgment of the district court is affirmed.