RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0006p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KELLY RICHARDS,

*Defendant-Appellant*.

┐
│
│
│
>   No. 24-3952
│
│
│
┘

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:23-cr-00058-1—Jeffery P. Hopkins, District Judge.

Decided and Filed:  January 9, 2026

Before:  McKEAGUE, GRIFFIN, and THAPAR, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:**  Gregory A. Napolitano, LAUFMAN & NAPOLITANO, LLC, Cincinnati, Ohio, for Appellant.  Alexis J. Zouhary, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

THAPAR, Circuit Judge.  A jury convicted Kelly Richards of trafficking minors, sexually exploiting children, and possessing a firearm as a felon.  Richards now appeals his conviction and sentence.  Finding no errors, we affirm.

I.

In early 2023, A.C. and L.W. lived at a group home called Hope Haven for Girls in Dayton, Ohio. The two girls were fourteen years old, although A.C. would turn fifteen during the events of the next few days. A.C. had previously met a man named "Scorpio" in Cincinnati, and she considered him a kind friend. But A.C. didn't know Scorpio's real name was Kelly Richards—or that he was a convicted felon with a long criminal history that included drug offenses and aggravated robbery.

A.C. and Richards stayed in touch using Facebook Messenger. One day, A.C. messaged Richards, asking him to pick her and L.W. up from Hope Haven so that they could "smoke and chill." R. 93, Pg. ID 1216–17. Richards then picked up the two girls, driving them around an hour back to his apartment in Cincinnati.

That apartment became a house of horrors. Richards encouraged the girls to smoke marijuana and use cocaine with him. He then invited "Bear"—a friend who had bought drugs from him—into the apartment, where the men showed each other their guns. A.C. testified that Richards raped her after Bear left. Richards also had sex with L.W., who recounted that she feared Richards would hurt her if she said no. Then Richards pressured the girls to perform sexual acts on one another.

The next day brought no respite. Richards demanded that L.W. have sex with his neighbor, Lorenzo, for money. She did so, but Richards got angry that she didn't get enough money from Lorenzo. Richards then made the two girls pose for pictures that he posted online to advertise them for prostitution. Over the next few days, Richards drove L.W. and A.C. to hotels and homes for sexual encounters with various men. A.C. testified that she was prostituted at least four times a day. All the while, Richards forced the girls to continuously use drugs so that they were never sober. And he pocketed any money the girls received from the encounters.

The girls had no easy way to escape. They didn't have cell phones, while Richards had a security system, a dog, and guns. The girls couldn't do anything without his permission. They feared he would hurt them if they left. And they had seen him point guns at them, pistol-whip his dog, break a board over that dog, and slap L.W. on the head. Despite their fear, L.W. and

A.C. hatched an escape plan. They snuck out of the apartment and ran to a neighboring one. The man who lived there drove them to A.C.'s brother's house. But her brother wasn't home, so the girls hitched a ride to A.C.'s sister's home.

Authorities eventually screened L.W. and A.C. as possible sex-trafficking victims. FBI Special Agent Nathan Holbrook investigated their case. He found ample evidence implicating Richards, including Facebook messages between him and the victims, the sex-trafficking ad, and IP addresses associated with Richards's apartment. Based on this evidence and the victims' testimony, Agent Holbrook obtained search warrants for Richards's person, apartment, and car. Those searches yielded two iPhones that contained pictures of the victims and messages arranging meetups with individuals who had paid for sex with the girls.

Based on that evidence, a grand jury indicted Richards on two counts of sex trafficking a minor, two counts of sexually exploiting a child, and one count of possessing a firearm as a felon. After a six-day trial, the jury found Richards guilty of all five counts. The district court sentenced Richards to 480 months of imprisonment followed by a life sentence of supervised release. Richards timely appealed his conviction and sentence.

On appeal, Richards raises five challenges. He claims that (1) he was denied a speedy trial, (2) the search warrants lacked probable cause, (3) the district court improperly denied his motion to represent himself, (4) the court improperly limited his cross-examination of Agent Holbrook, and (5) his sentence was substantively unreasonable. All his claims fail.

## II.

Richards first argues that he didn't receive a speedy trial, both under the Speedy Trial Act and the Sixth Amendment. He's wrong. The Act's time limit hadn't expired by the start of his trial. And any delay in Richards's case didn't violate his Sixth Amendment rights.

## A.

The Act generally requires trials to begin 70 days after a defendant's indictment or first appearance in court, whichever is later. *See* 18 U.S.C. § 3161(c)(1). But Congress didn't expect every trial to begin after exactly 70 days. After all, both prosecutors and defendants file plenty

of pretrial motions that often help set the ground rules for trial.  So the Act gives district courts time to consider and rule on those motions by stopping the clock when certain events occur.

These stoppages depend on whether a motion requires a hearing.  If it does, the speedy-trial clock stops from the filing of the motion to the hearing.  *Id.* § 3161(h)(1)(D); *United States v. Mentz*, 840 F.2d 315, 326 (6th Cir. 1988).  And if the court asks for further filings after the hearing, the clock stays paused until the court receives those filings.  *Mentz*, 840 F.2d at 326.  Afterward, the clock also stops for up to 30 days while the court takes the motion "under advisement."  *Id.* (quotation omitted); 18 U.S.C. § 3161(h)(1)(H).  But if the motion doesn't require a hearing, the clock only stops for up to 30 days after the court has received any needed submissions from the parties.  *Mentz*, 840 F.2d at 327.

We review a district court's legal interpretation of the Act de novo.  *United States v. Richardson*, 681 F.3d 736, 739 (6th Cir. 2012).  But we review the district court's decisions about which days are included or excluded from the 70-day trial clock for abuse of discretion.  *Id.*  Here, the district court correctly concluded that Richards's 70-day trial clock hadn't expired.

Part 1: Motion to Suppress

The 70-day clock started ticking on May 25, 2023, the day after Richards's indictment. Richards and the government agree that as of November 13, only 27 days had come off that clock.

In October, Richards moved to suppress evidence based on alleged Fourth Amendment violations.  So the speedy-trial clock remained stopped (at least) until the conclusion of the hearing on that motion, which occurred on November 15.[1]  *See* 18 U.S.C. § 3161(h)(1)(D).  At that hearing, the district court asked for post-hearing briefs from both parties, due 21 days after

---

[1]Richards wrongly believes that November 14 should have counted for the speedy-trial clock.  He's right that the court-imposed tolling stopped on November 13.  But his motion to suppress tolled the clock until the November 15 hearing on that motion.  *See* 18 U.S.C. § 3161(h)(1)(D).

the hearing transcript's production.  Richards and the government jointly requested an extension of time until January 10, 2024, when they filed their post-hearing briefs.**²**

So the speedy-trial clock was still stopped on November 15—the day of the hearing—and didn't resume until 30 days after the parties submitted their post-hearing briefs.  That's because the "time to receive supplemental filings from the parties for proper resolution of the motion" is excluded from the clock.  *Mentz*, 840 F.2d at 326.  And so are the 30 days after submission while the court takes the motion "under advisement."  *Id.* (quotation omitted).  Because the post-hearing briefs were filed on January 10, the clock didn't resume running until February 10.

Richards contends that at least some of this time should have counted against the speedy-trial clock.  But he's incorrect.  Below, he conceded that the clock remained tolled until well after the post-hearing briefs were submitted.  And when a defendant makes "a plain, explicit concession on the record addressing the precise issue later raised on appeal," we've treated it as a waiver.  *United States v. Clark*, 24 F.4th 565, 578 (6th Cir. 2022) (quotation omitted).

Setting waiver aside, the argument still fails.  Richards claims that the post-hearing briefs weren't "needed" for the court to rule on the motion and that the Supreme Court tolls the clock for post-hearing briefs only if they "are needed for proper disposition on the motion." Appellant's Br. at 18 (quoting *Henderson v. United States*, 476 U.S. 321, 331 (1986)).  But the district court *did* need the briefs.  At the hearing on the motion to suppress, the court told the parties it would take the post-hearing briefs "under advisement."  R. 32, Pg. ID 211.  It's true that some evidence *seemed* "dispositive" to the court and that its comments at the hearing resembled its later ruling on the motion.  Appellant's Br. at 18–20 (quoting R. 32, Pg. ID 165). But the district court is in the best position to determine what it needs to properly dispose of a motion.  *Henderson*, 476 U.S. at 327 n.8.  Here, the court had a "preference" for post-hearing briefs that it would consider and "then" rule on.  R. 32, Pg. ID 198, 204.  And it certainly didn't abuse its discretion by tolling the clock while it was waiting for those briefs.  *See Richardson*, 681 F.3d at 739.  So the speedy-trial clock stopped until 30 days after those briefs' submission.

---

**²**Although the government filed its post-hearing brief nine minutes late, the district court accepted it.  So we assume that the district court treated the brief as timely filed on January 10.

In sum, the 70-day clock had run for 27 days and then stopped until February 10, 2024.

Part 2:  Motion for Status Conference

That day, the clock started again—but not for long.  After only five days, the government filed a motion for a status conference to schedule the trial.  That motion stopped the clock at 32 days.  *See* 18 U.S.C. § 3161(h)(1)(D).  And after Richards filed a response to that motion on February 20, the clock stopped for at least 30 more days while the court had the motion "under advisement."  *Id.* § 3161(h)(1)(H); *see United States v. Jenkins*, 92 F.3d 430, 438–39 (6th Cir. 1996).  So the clock didn't resume until March 22, which was also the day after the court granted the motion for a status conference.  *See Jenkins*, 92 F.3d at 438–39.

Richards argues that this motion shouldn't have stopped the clock.  But he's wrong.

Richards first claims that the government's motion didn't comply with local rules, so it shouldn't have tolled the speedy-trial clock.  He points to a rule requiring a party filing a motion "to which other parties might reasonably be expected to give their consent" to consult with all parties about that motion and to state whether the motion is opposed.  S.D. Ohio Civ. R. 7.3(b); *see* S.D. Ohio Crim. R. 1.2, 1.3.  Richards argues the government didn't do that.  Thus, according to Richards, the motion wasn't "properly filed" and couldn't trigger tolling.  Appellant's Br. at 21–22 (quoting *Artuz v. Bennett*, 531 U.S. 4, 8 (2000)).

But the Act doesn't require motions to be "properly filed" to stop the clock.  It merely requires "filing."  That textual omission matters.  *Compare* 18 U.S.C. § 3161(h)(1)(D), *with Artuz*, 531 U.S. at 8 (citing 28 U.S.C. § 2244(d)(2)).  Filing occurs when a court officer accepts a document for entry into the record.  *Artuz*, 531 U.S. at 8.  And regardless of any failure to comply with local rules, the government's motion for a status conference was filed and docketed.  That means the speedy-trial clock stopped.[3]  *See United States v. Cianciola*, 920 F.2d 1295, 1299 (6th Cir. 1990).

---

[3] It's also not obvious that the government violated the local rule.  Is a motion for a status conference one "to which other parties might reasonably be expected to give their consent"?  S.D. Ohio Civ. R. 7.3(b).  Perhaps, but it's not among the listed examples.  *See id.*  In any event, the district court didn't find a violation of its own local rules here, even though Richards brought this argument before that court.

Richards then argues that a motion for a status conference doesn't qualify as a "pretrial motion" under the Act because it only "address[es] the running of the clock." Appellant's Br. at 24. In other words, he contends that motions *about* the clock can't stop it. But this argument ignores the plain meaning of the statutory text, Supreme Court precedent, and the record.

The Act plainly stops the clock for "*any* pretrial motion" that requires a hearing. 18 U.S.C. § 3161(h)(1)(D) (emphasis added). And it does the same for up to 30 days of "reasonably attributable" delay for "*any* proceeding" under advisement by the court. *Id.* § 3161(h)(1)(H) (emphasis added). The use of "any" means that every pretrial motion must "automatically" pause the speedy-trial clock. *United States v. Tinklenberg*, 563 U.S. 647, 653 (2011). Even a defendant's motion to dismiss under the Act itself stops the clock. *United States v. Sherer*, 770 F.3d 407, 411 (6th Cir. 2014).

In response, Richards provides only out-of-circuit and out-of-date precedent. He points to an Eleventh Circuit decision that a "document that does nothing more than remind the court that it must set a case for trial" doesn't constitute a "motion" under the Act. *United States v. Brown*, 285 F.3d 959, 962 (11th Cir. 2002) (per curiam). But courts shouldn't ask whether a pretrial motion "actually caused or was expected to cause delay of a trial." *Tinklenberg*, 563 U.S. at 660. That's because the text and structure of the Act require the clock to stop automatically after any pretrial motion. *Id.* at 663–66 (Scalia, J., concurring in part and concurring in the judgment). So the government's motion qualifies as a "pretrial motion" or "proceeding" under the Act. That means it stopped the speedy-trial clock.

After this stoppage, 38 days remained on the 70-day clock. But trial started only 32 days later. So even if the clock had run from the status-conference stoppage until trial, it couldn't have expired. And there were even more stoppages after the status conference. Richards filed several motions in the three weeks leading up to trial that each stopped the clock again. Thus, the district court correctly held that the speedy-trial clock didn't expire.

## B.

Richards's constitutional argument—that he didn't receive a "speedy and public trial" under the Sixth Amendment—fails too. U.S. Const. amend. VI. Richards didn't raise this issue

below, so we review it for plain error.  *United States v. Lester*, 98 F.4th 768, 776–77 (6th Cir. 2024).  That means any error must have been "obvious or clear."  *Id.* at 777 (quotation omitted).

Richards can't show a Sixth Amendment violation, let alone an "obvious or clear" error. To determine whether a defendant received a speedy trial, we look to (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant.  *Barker v. Wingo*, 407 U.S. 514, 530 (1972).  The first factor is a threshold requirement.  If "the delay is not uncommonly long," there's no constitutional violation.  *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006).

A delay of close to "one year is presumptively prejudicial," so it triggers analysis of the remaining factors.  *Id.*  We've drawn the exact "line" when this presumption kicks in at different places, sometimes at around eight to ten months.  *United States v. Brown*, 498 F.3d 523, 530 (6th Cir. 2007).  *But see United States v. Gardner*, 488 F.3d 700, 719 (6th Cir. 2007) (finding a nine-month delay insufficient).  But in all cases, any delay that the defendant caused doesn't count for purposes of calculating overall delay.  *United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000).

Here, the delay in Richards's trial wasn't uncommonly long.  Although the overall time between indictment and trial was about eleven months, Richards caused much of the delay.  He moved for a continuation of the trial, which delayed the trial date by three months.  And he moved to suppress evidence, which led to a hearing two days after the new trial date and to post-hearing briefing.  In fact, Richards didn't submit his own final brief on that motion until *five months* after the original trial date.  Because Richards is responsible for (at least) those five months of delay through his own motions, they don't count for purposes of constitutional delay. *Howard*, 218 F.3d at 564.  And the remaining six-month period isn't "uncommonly long." *Robinson*, 455 F.3d at 607; *Brown*, 498 F.3d at 530.  So Richards's constitutional claim falls short at step one.

Richards argues that we shouldn't apply a "bright-line" threshold period that blocks analysis of the other *Barker* factors.  Appellant's Br. at 28–29.  But the Supreme Court has directed us to do just that, calling the length of the delay a "threshold" before applying any other

factors. *United States v. Loud Hawk*, 474 U.S. 302, 314 (1986). Finding that threshold wasn't met here, we don't consider the remaining *Barker* factors, and Richards's Sixth Amendment claim fails.

### III.

Richards next claims that the affidavits supporting the government's search warrants contain contradictions, falsehoods, and material omissions. He believes that without those faulty statements, the government would have lacked probable cause to obtain the warrants. So he argues that the district court erred by refusing to suppress the evidence stemming from those searches or, at minimum, by refusing his request to examine Agent Holbrook about those affidavits at an evidentiary hearing. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

"When the district court has denied the motion to suppress, we review all evidence in a light most favorable to the Government." *United States v. Gilbert*, 952 F.3d 759, 762 (6th Cir. 2020) (quotation omitted). We review a district court's factual findings in deciding whether to hold a *Franks* hearing for clear error and its legal conclusions de novo. *United States v. Higgins*, 141 F.4th 811, 817 (6th Cir. 2025).

To justify suppression, Richards must first show he deserves a *Franks* hearing. 438 U.S. at 171. That's a "tall" task. *United States v. Sanders*, 106 F.4th 455, 470 (6th Cir.) (en banc), *cert. denied*, 145 S. Ct. 603 (2024). We presume warrant affidavits are valid. *Id.* (citing *Franks*, 438 U.S. at 171). So Richards must make a "substantial preliminary showing" that the affidavit includes "a knowing, intentional, or reckless falsehood." *Id.* at 471 (quoting *Franks*, 438 U.S. at 155–56). He must then show that the affidavit couldn't have established probable cause without such falsehoods. *Id.* The bar is even higher for omissions. Richards must show that the officer making the affidavit omitted information with the intent to mislead and that those omissions were "critical to the finding of probable cause." *Higgins*, 141 F.4th at 817 (quotation omitted).

Richards can't meet those demanding standards. He identifies three categories of misrepresentations or omissions, all of which fall far short of the necessary showing.

First, Richards argues that the two minor victims contradicted each other in their testimony, so their statements must have been false to some degree.  He points to differences in how the two girls described their sexual contact with Richards and other men.  But showing inconsistencies isn't enough.  *See United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013).  Richards must establish the victims' statements were false—and he can't do so.  In fact, in his opening brief, Richards doesn't identify a single specific false statement in the affidavits.  Instead, he points to his post-hearing briefing, where he marked swaths of statements from one of the affidavits as false.  Yet he bases that conclusion entirely on competing witness testimony—the two victims describing somewhat differently the horrific events they experienced.  Those differences alone don't show that Agent Holbrook knowingly, intentionally, or recklessly included any false statements in his affidavit.  *See Franks*, 438 U.S. at 155–56.

Next, Richards turns to omissions.  He believes that Agent Holbrook should have revealed that one phone number associated with Richards's alias "Scorpio" actually belonged to someone named "Shoo Shells."  Appellant's Br. at 40.  And he makes the same argument about a different phone number that was attached to Richards's online prostitution advertisement and belonged to "Erica Green."  *Id.*  But Richards can't show that Agent Holbrook was "*lying*" by not including this information.  *Higgins*, 141 F.4th at 817 (emphasis in original).  Instead, substantial evidence supported Agent Holbrook's belief that Richards was using those names as aliases to cover his tracks.  For example, the phone number associated with "Shoo Shells" appeared on a receipt next to the name "Scorpio" and Richards's address.  And the phone number associated with "Erica Green" was linked to Richards's IP address.  This corroborating evidence supports the information that Agent Holbrook included in the affidavits.  Without any substantial showing that Agent Holbrook intended to mislead the court or that the omissions would have changed the outcome of the search-warrant application, the court was well within its "significant discretion" to deny a *Franks* hearing.  *Id.*

Third, Richards believes Agent Holbrook should have included the criminal history of one of the minor victims in the affidavits.  But Richards doesn't make a substantial showing that Agent Holbrook knew about that criminal history and intentionally omitted it.  *See Sanders*, 106 F.4th at 471; *Higgins*, 141 F.4th at 817.  And even if he could, Richards would have to show that

the victim's juvenile crimes—drug possession and unruliness—were "critical to the finding of probable cause." *Higgins*, 141 F.4th at 817 (quotation omitted). He can't do that. The mere fact that one of the victims had juvenile offenses would not have undercut the weight of probable cause from evidence like the Facebook messages, the prostitution ad, the online pictures of the victims, and the victims' personal testimony. In short, the warrants' "issuance did not hinge on [the] detail" of these missing juvenile offenses. *Id.* at 818.

IV.

Next, Richards challenges the district court's decision to prevent him from representing himself. Our precedent has applied multiple standards of review to such a denial. We sometimes review the district court's decision de novo and other times for abuse of discretion. *See United States v. Powell*, 847 F.3d 760, 774 (6th Cir. 2017).

But when, as here, a defendant moves to represent himself mid-trial, we review the district court's decision for an abuse of discretion. That's because a court's mid-trial decision depends on "facts that utterly resist generalization." *Pierce v. Underwood*, 487 U.S. 552, 561–62 (1988) (quotation omitted). Each individual trial presents unique and pressing issues of timeliness, convenience, case management, and administration of justice. *Cf. United States v. Sullivan*, 431 F.3d 976, 980 (6th Cir. 2005) (discussing similar factors in the context of a motion to substitute counsel). The district court is best positioned to review these fact-specific concerns based on its "full knowledge of the factual setting." *Pierce*, 487 U.S. at 560. In short, abuse-of-discretion review gives district courts the "flexibility" they need to handle such mid-trial motions. *Id.* at 562; *see also Robards v. Rees*, 789 F.2d 379, 384 (6th Cir. 1986) (applying abuse-of-discretion review to a self-representation motion made after jurors had already been called).

Here, the district court was well within its discretion to deny Richards's motion to represent himself. True, criminal defendants like Richards have a Sixth Amendment right of self-representation. *Faretta v. California*, 422 U.S. 806, 832–33 (1975). But that right has limitations, such as "the timing of the request." *Jones v. Bell*, 801 F.3d 556, 565 (6th Cir. 2015). So the right is strongest when the defendant invokes it well before trial. *See Hill v. Curtin*, 792

F.3d 670, 678 (6th Cir. 2015) (en banc).  That's not what happened here.  Richards didn't ask to represent himself until the fourth day of the trial, just before the beginning of his case-in-chief.  We've routinely found that it's not an abuse of discretion to deny such a request after trial has started.  *See United States v. Martin*, 25 F.3d 293, 295–96, 296 n.3 (6th Cir. 1994); *United States v. Conteh*, 234 F. App'x 374, 381 (6th Cir. 2007).  And the district court, acting within that discretion, found that Richards wasn't entitled to self-representation at such a "late juncture in the proceedings."  R. 94, Pg. ID 1272–73.  It reasoned that Richards's counsel had ably represented him and that communication between attorney and client hadn't completely broken down.  So the court didn't abuse its discretion.

## V.

Richards also challenges the district court's decision to prevent him from cross-examining Agent Holbrook about a Seventh Circuit case, *United States v. Shelton*, 997 F.3d 749 (7th Cir. 2021).  In *Shelton*, the Seventh Circuit found that Agent Holbrook violated the Fourth Amendment by instructing an informant to search the defendant's office.  *Id.* at 768–69.  Richards argues that the district court erroneously blocked him from questioning Agent Holbrook about this case under Federal Rule of Evidence 403 and violated Richards's Sixth Amendment confrontation rights by doing so.[4]  We review limitations on cross-examination for abuse of discretion.  *United States v. Ralston*, 110 F.4th 909, 916 (6th Cir. 2024).

The district court didn't abuse its discretion by barring the *Shelton* line of questioning under Rule 403.  That rule allows courts to exclude evidence if its probative value is substantially outweighed by the risk of, among other things, confusing the issues or misleading the jury.  Fed. R. Evid. 403.  As the district court concluded, any questioning about Agent Holbrook's actions in *Shelton* would have only "marginal relevance."  R. 91, Pg. ID 747.  Richards's counsel conceded that, to be admissible, the questioning must speak to Agent Holbrook's "reputation for truthfulness."  *Id.* at 746; *see* Fed. R. Evid. 608(b).  And even though

---

[4]Richards also claims the district court's bar on this line of questioning entitled him to a *Franks* hearing.  *See supra* Part III.  But the district court properly found that Richards didn't make the required preliminary showing of false statements or material omissions, in part because other officers' investigation corroborated Agent Holbrook's testimony.  Without that showing, Richards's claim "fails at the outset."  *Higgins*, 141 F.4th at 817.

the *Shelton* court found Agent Holbrook's past actions "misleading," it also noted that he "answered honestly under oath." *Shelton*, 997 F.3d at 768–69. Prosecutors told the court in this case that Agent Holbrook would testify that his only "misleading" act was passing on poor legal advice he received from an attorney when he directed the informant's search. R. 91, Pg. ID 748. So testimony about that act wouldn't have told the jury much about Agent Holbrook's tendency to tell the truth.

In contrast, the district court saw a significant risk of confusing the issues or misleading the jury. It noted that several years had elapsed between Agent Holbrook's actions in *Shelton* and his investigation in this case. And it pointed to the difference between the sex trafficking at issue here and the corruption charges in *Shelton*. In sum, the district court found that this questioning would "sidetrack[]" the trial and confuse the jury. *Id.* at 751–52. This reasoning was well within the court's "broad discretion" under Rule 403. *Lester*, 98 F.4th at 776–77 (quotation omitted).

The district court's ruling didn't violate Richards's Confrontation Clause rights, either. The Sixth Amendment guarantees defendants only an "*opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original). That means trial judges still have "wide latitude" to reasonably limit cross-examination to avoid issues that would cause prejudice or confusion. *Ralston*, 110 F.4th at 917 (quotation omitted). Such limits are reasonable under the Confrontation Clause if the jury still has enough information to assess a defendant's theory of the case. *Id.*

Here, the jury had enough information to assess Richards's theory of the case without hearing questions to Agent Holbrook about an old and unrelated case. During his closing argument, Richards's counsel focused on the "web of lies" that he claimed the young victims had created. R. 96, Pg. ID 1367. He repeated the "lie" theme throughout his argument. *See id.* at 1378, 1386. The court's "narrow limitation" on Richards's ability to cross-examine one witness didn't block the jury from assessing Richards's defense. *United States v. Holden*, 557 F.3d 698, 704 (6th Cir. 2009). Therefore, the court didn't violate Richards's Confrontation Clause rights.

VI.

Lastly, Richards argues that his 480-month sentence was substantively unreasonable. We review the substantive reasonableness of his sentence for abuse of discretion. *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).

The U.S. Probation Office calculated a recommended Guidelines sentence of life imprisonment. But the district court imposed a below-Guidelines sentence of 480 months. Within-Guidelines sentences receive a presumption of reasonableness. *United States v. Patterson*, 158 F.4th 700, 704 (6th Cir. 2025). And Richards's below-Guidelines sentence was even more favorable to him than a within-Guidelines sentence. So he faces a "heavy burden" to show it was substantively unreasonable. *United States v. Lynde*, 926 F.3d 275, 282 (6th Cir. 2019) (quotation omitted).

Richards's efforts to meet that "heavy burden" fall far short. He claims the district court placed too much weight on his substantial criminal history because that history was too "remote." Appellant's Br. at 56. But he's wrong. The court didn't impose a longer sentence because it gave his criminal history too much weight. It merely refused to grant Richards a downward variance based on his past crimes' remoteness. That's well within the district court's considerable discretion. *See United States v. Owen*, 940 F.3d 308, 317 (6th Cir. 2019).

Richards also alleges that his sentence was out of step with national sentencing averages for other sex offenders. But the court explicitly considered national sentencing data and similarly situated defendants. It noted that, unlike many other defendants, Richards didn't plead guilty. That consideration bears great weight in cases like this one, where minor victims must testify at trial, facing their abuser in court and reliving their trauma. And Richards not only contested his guilt; he also "lied on the stand" and didn't show "a scintilla of remorse for his actions," even at sentencing. R. 103, Pg. ID 1768. Despite Richards's horrific crimes against multiple victims and refusal to accept responsibility, the district court still varied downward. So Richards's argument that the variance didn't go far enough lacks merit.

\*     \*     \*

One final note: Nearly two months after filing a reply brief, Richards moves for permission to file a pro se supplement to his existing counseled briefing. He seeks to add additional reasons why the affidavits supporting the government's search warrants were false. But Richards has counsel, and we usually don't consider supplemental pro se arguments from a represented defendant. *See United States v. Wilder*, 87 F.4th 816, 821–22 (6th Cir. 2023). Here, Richards waited almost two months after the briefing deadline to file his motion, and his supplement only argues issues that his attorney already discussed in his existing briefs. So we deny Richards's motion to supplement.

\*     \*     \*

We affirm.